1999-NMSC-035

990 P.2d 793

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Terry D. CLARK, Defendant–Appellant.**

No. 23,832.

Supreme Court of New Mexico.

July 8, 1999.

Rehearing Denied Sept. 22, 1999.

Gary C. Mitchell, P.C., Gary C. Mitchell, Ruidoso, for Appellant.

Patricia A. Madrid, Attorney General, William McEuen, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

SERNA, Justice.

{1} Defendant Terry Clark appeals his sentence of death for the murder of nine-year-old Dena Lynn Gore, pursuant to NMSA 1978, § 31–20A–4(A) (1979), which states that "[t]he judgment of conviction and sentence of death shall be automatically reviewed by the [S]upreme [C]ourt of the state of New Mexico." Clark raises numerous issues regarding his death sentence: (1) whether the trial court erred by striking potential jurors because of their opposition to the death penalty; (2) whether removal for cause of potential jurors in capital cases based on their religious objection violates the religious protections of the New Mexico Constitution; (3) whether the trial court abused its discretion by allowing the prosecution to question potential jurors as to their ability to vote for the death penalty; (4) whether the trial court erred by denying his objection to the prosecution's use of peremptory challenges to remove potential jurors reluctant to consider a sentence of death; (5) whether the trial court erred by restricting his presentation of mitigating evidence; (6) whether the trial court erred by admitting evidence regarding the circumstances of the crime and victim impact testimony; (7) whether the trial court erred by admitting evidence regarding his prior conviction; (8) whether the trial court erred by denying his motion to restrict the scope of the prosecution's penalty

phase closing arguments; (9) whether the tape record was so inaudible as to warrant a reversal; (10) whether the trial court erred by denying his motion for a new trial; (11) whether the Capital Felony Sentencing Act is constitutional; (12) whether his sentence withstands proportionality review; and (13) whether Clark may waive further appellate review of his case. We affirm his sentence.

## Facts and Background

{2} The Court of Appeals upheld Clark's conviction for kidnapping and first degree criminal sexual penetration of a six-year-old girl in *State v. Clark,* 104 N.M. 434, 722 P.2d 685 (Ct.App.1986), *denial of habeas corpus petition vacated by Clark v. Tansy,* 13 F.3d 1407 (10th Cir.1993). He received a sentence of twenty-four years imprisonment for these crimes, and was released on bond pending appeal when he abducted and murdered Gore. *State v. Clark,* 108 N.M. 288, 290, 772 P.2d 322, 324 (1989). Clark pleaded guilty to kidnapping in the first degree and capital murder of Gore in 1986, in the hopes of taking advantage of former Governor Toney Anaya's indication that he would commute a death sentence should Clark receive one before his term expired; however, he was not sentenced until after Anaya's term ended. *Id.* at 291, 772 P.2d at 325. A jury sentenced Clark to death in 1987, and this Court upheld the sentence on direct appeal in *Clark,* 108 N.M. 288, 772 P.2d 322. Clark filed a petition for writ of habeas corpus in the district court, which the court denied. After both this Court and the United States Supreme Court ruled that defendants in other capital felony sentencing proceedings were entitled to a jury instruction concerning their eligibility for parole, *see State v. Henderson,* 109 N.M. 655, 658–59, 789 P.2d 603, 606–07 (1990); *Simmons v. South Carolina,* 512 U.S. 154, 161–62, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), we reviewed the trial court's denial of Clark's petition for a writ of habeas corpus, vacated his death sentence, and remanded for resentencing because of the failure to provide such an instruction in his case, *see Clark v. Tansy,* 118 N.M. 486, 495, 882 P.2d 527, 536 (1994). In 1996, a jury again sentenced Clark to death, and this second direct appeal follows.

## Discussion

{3} Without authority or specificity, Clark attempts to preserve "all issues which had been raised in all docketing statements and in all cases prior to the re-sentencing.... In order to preserve any and all issues for future habeas relief, review by the Supreme Court of the state of New Mexico, and/or review by any United States District Court, and United States circuit Court of Appeals, and the United States Supreme Court, reference is made to those issues and by reference thereto they are respectfully made a part hereof." The Court of Appeals has previously held:

> Defendant appears to have made an effort to avoid abandonment of any of his issues by stating, in his brief-in-chief, that the brief incorporates all arguments and authority included in the docketing statement. This is not an acceptable briefing practice, and we hold that it does not operate to preserve any of the issues not specifically argued in the briefs.
>
> The appellate rule concerning briefing does not provide for incorporation of arguments contained in other pleadings. [Rule 12–213 NMRA 1999]. Allowing such a practice would force opposing counsel and this court to reexamine the docketing statement and other pleadings such as memoranda in opposition to ensure that all of the issues discussed in those documents have been addressed. In addition, it would force this court and opposing counsel to speculate as to which issues a party genuinely wishes to preserve and which the party feels have no merit....
>
> ... All issues raised in the docketing statement but not argued in the briefs have been abandoned.

*State v. Aragon,* 109 N.M. 632, 634, 788 P.2d 932, 934 (Ct.App.1990) (citations omitted). Similarly, we address only those issues properly before this Court within the briefs of the parties. *See Clark,* 108 N.M. at 311, 772 P.2d at 345 ("Twenty-three issues were initially raised in Clark's docketing statement. The issues not addressed here were not briefed and are, therefore, abandoned.").

## 1. The Trial Court's Rulings Regarding Prospective Jurors

{4} Clark argues that the trial court struck prospective jurors because they were opposed to the death penalty based upon religious reasons or because they would not consider capital punishment if Clark were to be imprisoned until age eighty-six, and that the trial court denied some of his motions to challenge potential jurors based on Clark's belief that they were predisposed towards the death penalty. Clark reasons that these actions violated his right to an impartial jury. *See* U.S. Const. amend. VI; N.M. Const. art. II, § 14. Clark also argues, without support, that seating jurors who lean towards the death penalty improperly shifts the burden of proof.

{5} This Court rejected similar arguments in prior cases, holding that "a juror is properly excludable for cause if the juror's views would 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath.'" *State v. Sutphin*, 107 N.M. 126, 129, 753 P.2d 1314, 1317 (1988) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). This Court held that the trial court is in the best position to "assess a juror's state of mind," based upon the juror's demeanor and credibility, and thus, it is "within the trial court's discretion as to whether a prospective juror should be excused," balanced by the trial court's protection of the rights of the defendant. *Id.* "We will not disturb the trial court's decision absent a clear abuse of discretion or a manifest error." *Id.* at 130, 753 P.2d at 1318. The United States Supreme Court also emphasized that "deference must be paid to the trial judge who sees and hears the juror." *Witt*, 469 U.S. at 426, 105 S.Ct. 844.

{6} The State notes that Clark stipulated in the trial court that several jurors were properly excluded, waiving his argument regarding these individuals on appeal. *Cf. State v. Campos*, 1996–NMSC–043, ¶ 47, 122 N.M. 148, 921 P.2d 1266 ("Acquiescence in the admission of evidence . . . constitutes waiver of the issue on appeal."). Clark specifies F. Torres, Ochoa, Cordova–Mar-

quez, and M. Torres, as prospective jurors which the court improperly excluded. The record indicates that Clark stipulated that F. Torres was properly excluded under the *Witt* standard because she stated that she would not consider capital punishment as an alternative to a life sentence, although he did preserve his objection that she was excluded upon the basis of her religion, which we address below. Similarly, the record indicates that Clark agreed that Ochoa would automatically vote for a life sentence, indicating her inability to view the proceedings impartially, and agreed to her excusal. The record also indicates that Clark agreed that Cordova–Marquez too could be properly excluded. M. Torres also stated that, because of his religious ideology and because of his belief that life imprisonment is more severe than the death penalty, he would vote automatically for life imprisonment; thus, the prosecutor challenged him for cause, and Clark agreed. Clark's counsel apparently asserts that he realized, "later in the first day," that "jurors were eliminating themselves because they felt that if you were imprisoned to age eighty-six, that would be satisfactory mitigation and would not consider the death penalty, [and that he] objected to striking jurors for that reason." Even if Clark had properly objected in a timely manner, we conclude that the trial court did not abuse its discretion in removing these jurors under the *Witt* standard.

{7} Clark argues that if these prospective jurors are indicating that the consideration of the mitigating circumstance of imprisonment until at least age eighty-six would lead them to vote for a life sentence rather than the death penalty, then these jurors should not be excluded under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), or *Witt* because they are simply following the law and concluding that Clark should receive a life sentence. However, this reasoning by jurors indicates that they are basing their decision upon one factor, whether Clark will be imprisoned for life, before hearing any evidence, rather than considering all mitigating and aggravating circumstances before them, as required by their duty as jurors. The trial court may properly

exclude prospective jurors who indicate that they could not vote to impose the death penalty under any circumstances.. *See State v. Trujillo,* 99 N.M. 251, 252, 657 P.2d 107, 108 (1983).

■ {8} Additionally, Clark objected to the trial court's decision to strike Churchill from the jury, as he stated that he leaned towards voting for a life sentence, and Clark asserts that Churchill would have been willing to listen to and consider the case. The State argues that Churchill said that he had "a great reluctance" to vote for capital punishment, that he leaned strongly towards a life sentence, and that he requested that he not be picked for the jury. The trial court characterized this decision as its most difficult, and, based upon Churchill's demeanor and statements, found that Churchill would find it difficult to follow the law and was thus significantly impaired in his ability to serve as a juror. Following a careful review of the record, we agree that this was a difficult decision; however, "[a]bsent manifest abuse of discretion, we will not disturb a trial court's determination of questions of juror bias." *See State v. McGuire,* 110 N.M. 304, 312, 795 P.2d 996, 1004 (1990). We conclude that the trial court did not abuse its discretion.

■ {9} The trial court denied Clark's motions to remove Rosales, Scullion, and Redford for cause. Clark states that Rosales indicated that he is against plea bargaining and was antagonistic during questioning, while Scullion indicated that he would lean more towards the death penalty. The State counters that Rosales expressed repeatedly that he had not made up his mind and would have to hear all of the evidence before he would make a decision. Scullion stated that

he would consider both options after hearing all of the evidence, although he tended towards the death penalty, characterized as a six to seven on a scale of ten. Clark notes that Redford stated that the defense would have more difficulty in convincing him to vote for a life sentence because the victim was a child. Redford stated that he could consider both aggravating and mitigating circumstances, but noted that he had two daughters, and said that crimes against children are worse than crimes against adults. We conclude that the trial court did not abuse its discretion.[1] *See McGuire,* 110 N.M. at 312, 795 P.2d at 1004 (holding that trial court did not abuse its discretion by denying the defendant's motions to dismiss jurors for cause when they all proclaimed that they could be impartial even though one juror admitted to a "leaning" towards a guilty verdict based upon pretrial publicity); *Stamper v. Muncie,* 944 F.2d 170, 177 (4th Cir.1991) (holding that leaning towards the death penalty is not the same as an automatic vote for the death penalty); *Isaacs v. State,* 259 Ga. 717, 386 S.E.2d 316, 328 (1989) (holding that the trial court did not err in finding that jurors were qualified to serve despite the defendant's challenges on "reverse-*Witherspoon* grounds").

■ {10} The trial court may properly exclude a juror for cause if the juror's views would substantially impair the performance of the juror's duties in accordance with the instructions and oath. This Court has stated that the trial court is in the best position to assess a juror's state of mind, by taking into consideration the juror's demeanor and credibility. It is within the trial court's discretion as to whether a prospective juror should be excused. Because there was not a clear

---

1. The State notes that Rosales, Scullion, and Redford did not deliberate Clark's sentence: Rosales' name was not reached during the selection process, Scullion was peremptorily stricken by Clark, and Redford was chosen as an alternate after Clark exhausted his peremptory challenges. However, the State also notes that this Court held that prejudice is presumed when a defendant uses a peremptory challenge to remove a juror who should have been excused for cause, and exhausts all his or her peremptory challenges before jury selection is completed. *See Fuson v. State,* 105 N.M. 632, 634, 735 P.2d

1138, 1140 (1987). The State urges this Court to overrule *Fuson* because the federal precedent upon which it was based has been eliminated by the Supreme Court in *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), which held that: "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." Because we conclude that the trial court did not abuse its discretion in denying Clark's motions for removal for cause, it is unnecessary to reach this argument.

abuse of discretion or a manifest error in this case, we will not disturb the trial court's decision.

## 2. Jurors' Religious Opposition to Capital Punishment

{11} Clark asserts that removal for cause of jurors in capital cases based on their religious objection violates the religious protections of the New Mexico Constitution. He argues that the trial court struck "jurors who were opposed to the death penalty for religious reasons," in violation of Article VII, Section 3 of the New Mexico Constitution, which states in part that: "The right of any citizen of the [S]tate to ... sit upon juries[ ] shall never be restricted, abridged or impaired on account of religion. . ..." Clark analogizes this issue, exclusion because of the jurors' religious beliefs, to the exclusion of jurors based upon their race. Further, Clark asserts that other provisions of the New Mexico Constitution support this notion. Clark states that "[w]hen a religiously scrupled juror is challenged successfully for cause, that juror's right to serve on a jury is impinged upon." Clark enumerates prospective jurors who described their inability to apply the capital punishment sentence to any defendant based upon religious convictions.

{12} Clark incorrectly relies upon *Lockhart v. McCree*, in which the Supreme Court held that "the exclusion from jury service of large groups of individuals *not on the basis of their inability to serve as jurors, but on the basis of some immutable characteristic* such as race, gender, or ethnic background, undeniably gave rise to an 'appearance of unfairness.'" 476 U.S. 162, 175, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (emphasis added); *see also Batson v. Kentucky*, 476 U.S. 79, 87, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (concluding that "by denying a person participation in jury service on account of his [or her] race, the State unconstitutionally discriminated against the excluded juror"). Clark argues that religious belief should be included with race, gender, or ethnic background as an immutable characteristic. In the context of jury selection, however, the immutable characteristics of race and gender are clearly distinguishable from that of religious belief.

The individuals excluded from Clark's jury stated that they would be unable to apply the law to this or any other capital punishment case because their religious ideology prohibits imposing a death penalty judgment. Thus, rather than the court excluding jurors because they are members of a particular religion, the court excluded jurors who were unable to apply the law.

{13} Clark argues that the State has no compelling interest in death qualified juries. He asserts that the death penalty is rarely used, that it is not a deterrent, and that life imprisonment provides a reasonable alternative. Clark makes frequent, unpersuasive comparisons to slavery and racial discrimination, implying that Hispanic Catholics in particular are suffering from the State's discrimination. There is no evidence, and Clark does not overtly assert, that any juror was removed based upon his or her race. Further, the State notes that six of the jurors who returned a sentence of death for Clark identified themselves as Catholic, supporting the notion that jurors were removed based upon their inability to be impartial, rather than their religious beliefs. *See State v. Eason*, 336 N.C. 730, 445 S.E.2d 917, 923 (1994) (concluding that a prospective juror was removed because of her reservations about the death penalty rather than her religious affiliation, supported by the fact that another juror, who had the same religious affiliation but expressed no reservations about the death penalty, was chosen to sit on the jury).

{14} Clark observes that the United States Supreme Court has held that it is unconstitutional for city ordinances to single out a particular religion and prohibit its free exercise. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Clark then analogizes this reasoning to the "actions of the government in this case in discriminarily [sic] selecting a jury by striking those whose religious beliefs cause them to be opposed to the death penalty." Clark points to New Mexico's history of protected religious freedom as further support for his position that "New Mexicans have a specific

right to participate on juries irrespective of their religious opinions."

{15} As discussed above, this Court addressed whether the trial court may remove prospective jurors for cause when the jurors are opposed to the death penalty in *Sutphin*, 107 N.M. at 129, 753 P.2d at 1317. The defendant in *Sutphin* argued that the removal of jurors denied his rights to due process and a fair and impartial jury. *Id.* A trial court may properly exclude a juror for cause if the juror's views would prevent or substantially impair the performance of the juror's duties. Although Clark argues that the State has no compelling interest in a death qualified jury, this Court "recognized the state's legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate the administration of a state's death penalty scheme." *Id.*

{16} We hold that the trial court properly removed prospective jurors for cause, when those jurors opposed the death penalty, because the jurors were unable to view the proceedings impartially and perform their duties in accordance with the juror's oath, not because of their religious opinion or affiliation. *See State v. Willoughby*, 181 Ariz. 530, 892 P.2d 1319, 1335 (1995) (en banc) ("Although religious beliefs may motivate one's opinion about the death penalty, the beliefs themselves are not the basis for disqualification."); *Wolf v. Sundquist*, 955 S.W.2d 626, 631 (Tenn.Ct.App.1997) (holding that "[i]n light of the affirmative constitutional mandate to provide impartial juries in criminal cases, the State has an important interest in obtaining juries that do not contain members who, because of their religious beliefs, are unable to follow the law or the trial court's instructions"). "[R]eligious freedom embodies two complementary concepts—the freedom to believe and the freedom to act. The freedom to believe is absolute, while the freedom to act is subject to reasonable control for the protection of others." *Wolf*, 955 S.W.2d at 630 (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)) (citations omitted). Prospective jurors "were not excluded because of their religious beliefs but because they stated, in effect, that they could not be impartial and unbiased." *Id.* at 631. "When a potential juror has convictions that would prevent him or her from voting to impose the death penalty, without regard to the evidence presented at trial, that juror is properly excused for cause." *Eason*, 445 S.E.2d at 921 ("The potential juror here was not stricken solely because she was a Jehovah's Witness, however. Rather, the prospective juror, because of her strong personal and religious convictions, expressed reservations about the death penalty and was stricken because of these reservations."). As the State asserts, jurors excluded from capital cases for this reason are not deprived of any constitutional right because they can serve on non-capital cases. *See Buchanan v. Kentucky*, 483 U.S. 402, 416, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987) (noting that jurors excludable for cause because of their views on the death penalty "are not substantially deprived of their basic rights of citizenship, because they are not prevented from serving as jurors in other criminal cases" (internal quotation marks omitted)).

{17} The trial court's removal for cause of jurors in Clark's case was based on their inability to apply the law and follow the jury oath. The fact that the potential juror's inability to perform his or her duty is based upon religious objection and belief does not violate the religious protections of the New Mexico Constitution, because exclusion from the jury was not based upon religious affiliation.

### 3. Prosecution Questions Regarding Jurors' Ability to Vote for a Death Penalty

{18} Clark's third argument is that the trial court erred by allowing the State, during voir dire, to question prospective jurors whether they could impose the death penalty upon Clark, whether they could sign their name to a jury finding sentencing him to death, and whether the jurors could face Clark in court and acknowledge their vote for the death penalty. Clark argues that this error violated his right to a fair trial. Clark asserts that the jurors, under oath, promised

the State that they would give the death penalty. *See, e.g., Adams v. Texas*, 448 U.S. 38, 50, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) (reversing a death sentence because of improper questions regarding whether the imposition of the death penalty would "affect" jurors' performance of their duty). After Clark's objection, the prosecutor explained that he was asking whether each prospective juror could, not would, impose the death penalty if the juror found an aggravating circumstance beyond a reasonable doubt, and that this circumstance outweighed mitigation. Clark contends that, because the jury could find that the aggravating circumstances outweigh the mitigating circumstances and still sentence Clark to life imprisonment, the prosecutor's questions were improper.

{19} Clark relies on several distinguishable or inapplicable cases. For example, the Fifth Circuit reversed a death sentence because potential jurors were improperly excused for being unable to conclusively state that imposing the death penalty would not affect them or that a possibility of a death sentence would make them take their duties as jurors with "unusual seriousness." *Burns v. Estelle*, 626 F.2d 396, 397 (5th Cir.1980) (en banc). The court noted that "neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." *Id., accord Adams*, 448 U.S. at 50, 100 S.Ct. 2521. Similarly, without discussing the specific remarks the prosecution made, the Mississippi Supreme Court noted, in dicta, that "[t]he prosecution and circuit judge should ... avoid questions seeking a promise or commitment from the jury to convict if the state proves certain facts." *West v. State*, 485 So.2d 681, 686 (Miss.1986). Unlike these cases, the prosecutor did not attempt to extract promises by jurors, but was instead attempting to ascertain whether they could impose the death penalty if they found that the aggravating circumstances outweighed the mitigating circumstances. The questions were relevant to determine whether the jurors could impose the death penalty, to uncover bias or prejudice, and to assist both parties in exercising their peremptory challenges.

{20} "[T]he district court has discretion in determining how voir dire should be conducted and reversal is available only where the discretion is abused." *Trujillo*, 99 N.M. at 252, 657 P.2d at 108. Because this questioning did not commit jurors to return a death sentence, the trial court did not abuse its discretion by allowing the prosecutor to question potential jurors whether they could sign a death verdict and announce this finding in court. *See Isaacs*, 386 S.E.2d at 328–29 (concluding that there was no error in questioning a potential juror whether she could say in open court that the defendant be sentenced to death because "agreeing to a sentencing verdict *is* a part of every juror's duty, since a poll of the jury is required at the sentencing phase of a death penalty trial"); *People v. Ganus*, 148 Ill.2d 466, 171 Ill.Dec. 359, 594 N.E.2d 211, 215 (1992) ("A venireman's professed inability to sign the death warrant forms and impose the death penalty has been held to indicate that that venireman would not meet the requisite standard for performance of his duties as a juror."); *State v. Kreutzer*, 928 S.W.2d 854, 866 (Mo.1996) (en banc) (holding that the trial court did not abuse its discretion, noting that the "Court ha[d] previously and repeatedly rejected the claim that asking whether a prospective juror could sign a death verdict if selected as foreperson improperly seeks a commitment from the venireperson," and that "[a]bility to assess the death penalty as jury foreperson is a proper basis for follow-up questioning directed to an equivocating venireperson"); *Commonwealth v. Holland*, 518 Pa. 405, 543 A.2d 1068, 1073–74 (1988) (holding that the trial court did not err by allowing the prosecution to question prospective jurors regarding their ability to announce a death sentence in an appropriate case).

### 4. The State's Peremptory Challenges

{21} Clark's fourth argument is that the State's use of its peremptory challenges to strike jurors who were less inclined to consider the death penalty violated his right to a fair and impartial jury. Although

Clark concedes that *Batson*, unlike his case, involved racial discrimination, he objected based upon *Batson*, arguing that the State used its challenges to deliberately attempt to deprive him of a fair jury. Clark admits that he is unable to submit a New Mexico case on point, and also does not offer any supportive cases from other jurisdictions.

{22} The State contends, and we agree, that there appears to be "universal agreement that no *Batson* violation results when jurors are peremptorily excused because of their reluctance to impose the death penalty." *State v. Bolton*, 182 Ariz. 290, 896 P.2d 830, 842 (1995) (en banc) (rejecting a similar argument and holding that "[t]he *Batson* rule does not . . . apply to cases where the state uses its peremptory strikes to remove potential jurors not excludable for cause who have expressed reservations about capital punishment"); *accord, e.g., People v. Davis*, 794 P.2d 159, 208–09 (Colo.1990) (en banc) (stating that "[w]e agree that it is not inappropriate for a prosecutor to use his [or her] peremptory challenges to exclude jurors who, although they have indicated they can follow the law, have expressed reservations about their ability faithfully to do so or who have indicated that they disagree with the judgment of the people acting through their legislature that certain crimes are deserving of the ultimate penalty"); *State v. Brogden*, 329 N.C. 534, 407 S.E.2d 158, 166 (1991) (holding that the trial court did not err under either the Federal or North Carolina Constitutions by allowing the state to exercise peremptory challenges to remove potential jurors based on their qualms regarding capital punishment); *State v. Bell*, 305 S.C. 11, 406 S.E.2d 165, 168 (1991) (holding that a peremptory "challenge is proper even if the juror merely expresses scruples against the death penalty that would not be sufficient to excuse him or her for cause").

{23} The trial court did not err in denying Clark's objection to the State's use of peremptory challenges to remove potential jurors who are reluctant to impose capital punishment. The State's use of peremptory challenges in this fashion did not violate Clark's right to a fair and impartial jury.

### 5. Mitigating Evidence

{24} Clark's fifth point is that the trial court erred by restricting his presentation of mitigating evidence. Clark wanted his former lawyers to testify as to their personal opinions of Clark, capital punishment, and former Governor Anaya's grant of clemency to others on death row. Clark wanted Anaya to testify regarding the clemency he gave to others and whether he would have commuted Clark's death sentence, had he been sentenced prior to the end of his term. The trial court prohibited Clark from calling religious leaders to testify regarding capital punishment, religious doctrine, and their personal opinions of capital punishment. Finally, Clark attempted to present evidence that he was treated differently than others on death row whose sentences were commuted, and he attempted to have an expert testify about proportionality.

{25} Clark asserts that NMSA 1978, § 31–20A–6 (1979), does not limit mitigating evidence, which is further defined by UJI 14–7029 NMRA 1999, as "any conduct, circumstance or thing which would lead [the jury] to decide not to impose the death penalty." Clark also states that *State v. Compton*, 104 N.M. 683, 695, 726 P.2d 837, 849 (1986), supports the notion that the jury is given broad discretion to consider any factor in mitigation of the death penalty. However, the defendant in *Compton* argued that the trial court erred in refusing to give the jury his tendered instructions of specific non-statutory mitigating circumstances. *Id.* We held that "[the] instruction [which the jury actually received] gave the jury broad discretion to consider *any* factor in mitigation of the death penalty, in addition to any statutory mitigating circumstances." *Id.* In other words, this discussion in *Compton* stands for the proposition that a defendant is not entitled to a jury instruction which specifically lists non-statutory mitigating circumstances when a broad instruction informs the jury to consider all mitigating factors before it; it does not hold, as Clark infers, that a defendant has no limitation to the mitigating evidence the defendant wishes to submit.

{26} Clark also lists numerous cases from other jurisdictions which he contends

support his assertion that there is no limitation on mitigation evidence, although, as he does note, such evidence must be relevant and material. Most of the examples Clark cites fall squarely within our statute and rule: a defendant's youth, family history, and likelihood of rehabilitation, circumstances of the crime which tend to justify, excuse, or reduce the crime, and a defendant's emotional or psychological history. *See, e.g., McCampbell v. State,* 421 So.2d 1072, 1075–76 (Fla.1982) (discussing potential for rehabilitation as a mitigating circumstance). However, the evidence which Clark wished to present to the jury does not fall within these examples; Anaya's religious and moral beliefs against the death penalty, church doctrine regarding the death penalty, and lawyers' personal opinions about the death penalty are not similar to the evidence at issue in the cases Clark cites. Clark does not offer cases which allowed this type of evidence. Clark's excluded evidence is also not similar to his examples of other cases which allow evidence not specifically listed in our statute or rule, such as polygraph evidence, the victim's daughter's anti-death penalty stance, and good prison conduct. *See, e.g., Floyd v. State,* 497 So.2d 1211, 1213–14 (Fla. 1986) (discussing non-statutory mitigation evidence regarding the murder victim's daughter's opposition to the death penalty).

{27} The State responds that the statute authorized Clark to present, for example, evidence regarding his character, background, circumstances of the offense, mental or emotional disturbances, and his prospects for rehabilitation. The State recognizes that mitigating evidence of this type is directly related to his personal culpability. *See Penry v. Lynaugh,* 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (noting "that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense"). We agree with the State's contention that the trial court retains its authority to exclude as irrelevant evidence not regarding the defendant's character, his record, or circumstances of the offense. While concluding that the Eighth and Fourteenth Amendments require that the sentencing jury "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," a plurality of the Supreme Court noted that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett v. Ohio,* 438 U.S. 586, 604 & n. 12, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). Thus, we hold that the trial court did not err by excluding evidence which was not relevant to Clark's character, record, or circumstances of his offense, including the personal beliefs of Anaya and religious doctrine.

{28} Additionally, the State argues that courts from other jurisdictions reject the type of evidence which Clark advances. *See Taylor v. State,* 666 So.2d 36, 53 (Ala.Crim. App.1994) ("It is the holding of this Court that the opinion of the friends or relatives of the defendant that the defendant should not be sentenced to death is not a relevant mitigating circumstance for the jury to consider at the penalty phase of a capital case."). The trial court expressed its concern that testimony of religious leaders and lawyers regarding the propriety of the death penalty was not relevant mitigating evidence, and it may urge jury nullification of state law. We agree. *See Glass v. Butler,* 820 F.2d 112, 115–16 (5th Cir.1987) (concluding that a priest's testimony that the church is opposed to the death penalty is not relevant mitigation evidence); *Commonwealth v. Daniels,* 537 Pa. 464, 644 A.2d 1175, 1183 (1994) (per curiam) (holding "that the trial judge properly restricted defense counsel's references to the Bible in support of his argument that the death penalty is morally wrong").

{29} Clark next asserts that proportionality evidence should be admissible as mitigation. The cases upon which Clark relies involve the sentences received by co-defendants and accomplices, which is clearly distinguishable from this case, where Clark acted alone. Proportionality evidence is not proper for the jury to consider as mitigation.

{30} "The death penalty shall not be imposed if ... the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Section 31–20A–4(C)(4). In discussing Section 31–20A–4(C), we held "that only this Court can decide if a sentence of death is excessive or disproportionate." *State v. Garcia*, 99 N.M. 771, 779, 664 P.2d 969, 977 (1983). We stated that "[u]nder the plain language of Section 31–20A–4, proportionality review is conducted by this Court on appeal, after a conviction and death sentence is handed down by the district court." *State v. Wyrostek*, 117 N.M. 514, 518, 873 P.2d 260, 264 (1994). This Court noted that "the proportionality of a death sentence is not properly considered by the district court in a nonjury sentencing proceeding." *Id.* at 519, 873 P.2d at 265. This Court clearly rejected the argument "that a sentencing jury should perform the legal analysis of proportionality review when determining the sentence of a Defendant convicted of a capital felony," because we held that "the proportionality of a death sentence is a question of law" and "clearly a question for this Court." *Id.* at 520 n. 6, 873 P.2d at 266 n. 6. Simply because Clark characterizes this argument as offering disproportionality evidence as mitigation to the jury does not subvert what this Court has previously decided: proportionality review is a function of this Court, not the jury. The trial court correctly concluded that only this Court should review proportionality, as this Court explicitly held in *Wyrostek*.

{31} Additionally, the State reasons that proportionality evidence has the same problems as evidence regarding a religious leader's testimony of church doctrine in that the focus does not directly concern Clark and his crime. *See State v. Smith*, 280 Mont. 158, 931 P.2d 1272, 1282 (1996) (holding that the trial court did not err in refusing to consider defendant's offered proportionality evidence, because this type of evidence "does not relate to the specific defendant and the specific crime(s) before the sentencing judge, and therefore cannot be considered as a mitigating factor," and because the Montana Supreme Court reviews proportionality of death sentences). The State also notes that "receiving information as to the relative culpability of other defendants would involve a monumental trial within a trial, so that any probative value would be outweighed by the substantial danger of confusing the issues and consumption of time."

{32} The trial court did not err in restricting Clark's offer of proportionality evidence, because proportionality review is unquestionably a matter for this Court. Additionally, the trial court did not err by refusing to allow Clark to present evidence regarding particular individuals' opinions about the death penalty because such evidence does not bear upon Clark's character, prior record, or the circumstances of his crimes.

### 6. Circumstances of the Crime and Victim Impact Testimony

#### A. Circumstances of the Crime

{33} Clark argues that the trial court erred by allowing the State to introduce evidence regarding how and where the victim's body was found, pictures of her body, the type of grave in which she was buried, the autopsy, the cords on the body, the location of the gun shot wounds, and the determination of death. Clark notes that the autopsy results were not in dispute and that he had pleaded guilty to the capital murder of Gore. Clark objects to Gore's mother's testimony in which she described the last time she saw Gore, what Gore was wearing, and that she told her daughter to "be careful, come right back," as well as what she was thinking as she waited for Gore to return. She testified that she had her children fingerprinted, and that she did not see Gore again.

{34} We have previously rejected this precise argument from Clark. In *Clark*, 108 N.M. at 299, 772 P.2d at 333, this Court stated that

Ms. Gore's testimony was admissible under NMSA 1978, [§ ] 31–20A–1(C) [ (1979) ] for two reasons. First, the testimony was relevant to show the aggravated circumstance of kidnapping. Despite Clark's plea of guilty, the State was still required to prove beyond a reasonable doubt that the

murder was committed during the course of a kidnapping, and the State was not required to present its case in the abstract. Second, the testimony was directly related to the circumstances of the crime itself. While Clark had entered a guilty plea to all charges and he was willing to stipulate to the facts surrounding the girl's disappearance, guilty pleas and stipulated facts are no substitute for the evidence of a crime to be considered by a jury.

This portion of Ms. Gore's testimony, as well as the testimony of the pathologist and officers is not victim impact testimony, as it does not include "descriptions of the character and reputation of the victim; descriptions of the emotional impact of the crime upon the victim's family; and opinions of the victim's family characterizing the crime or the defendant." *Clark*, 108 N.M. at 299, 772 P.2d at 333. The trial court did not err in admitting testimony and evidence which related directly to the circumstances of Clark's crime.

## B. Victim Impact Testimony

{35} Prior to trial, Clark moved to prohibit and restrict testimony of the victim's parents. The trial court allowed Gore's parents to make brief statements to the jury. Clark claims that the introduction of these statements to the jury violated his rights to due process and to a fair trial because evidence of Gore's personal characteristics is irrelevant to prove the existence of the aggravating circumstances of the crime and would inflame the passions of the jury. Further, relying upon *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), Clark asserts that the statements violated the prohibition against cruel and unusual punishment.

{36} The Supreme Court, in *Payne*, held that

if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.

There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne*, 501 U.S. at 827, 111 S.Ct. 2597. "Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Id.* at 824, 111 S.Ct. 2597.

{37} Clark urges this Court to continue to follow *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), despite the fact that the Supreme Court overruled *Booth* in *Payne*, 501 U.S. at 830, 111 S.Ct. 2597. Although we were bound by *Booth*'s restriction on victim impact evidence in *Clark*, 108 N.M. at 298–300, 772 P.2d at 332–34, we agree with Clark that the decision to admit or restrict this type of evidence now rests with the states, because the Supreme Court in *Payne* concluded that such evidence, brief and narrowly presented, does not violate the prohibition against cruel and unusual punishment or due process guarantees. *See Payne*, 501 U.S. at 825, 111 S.Ct. 2597; *id.* at 831, 111 S.Ct. 2597 (O'Connor, J., concurring). We hold that victim impact evidence, brief and narrowly presented, is admissible during the penalty phase of death penalty cases.

{38} Further, we hold that victim impact testimony is consistent with the Capital Felony Sentencing Act following *Payne* because it constitutes additional evidence as to the circumstances of the crime under Section 31–20A–1(C) and NMSA 1978, § 31–20A–2(B) (1979). Through Section 31–20A–1(C), the Legislature requires the jury to consider evidence of the circumstance of the crime, and many other courts have also held that victim impact testimony is relevant for this purpose. *See United States v. McVeigh*, 153 F.3d 1166, 1219 (10th Cir.1998) (holding that the effects of the victims' deaths upon the families is part of the circumstances of the crime and is properly presented to the jury at the penalty phase), *cert. denied*, 526 U.S. 1007, 119 S.Ct. 1148, 143 L.Ed.2d 215 (1999); *State v. Bernard*, 608 So.2d 966, 971 (La.1992) (holding that the impact upon the victims is relevant to circumstances of the

crime); *People v. Edwards*, 54 Cal.3d 787, 1 Cal.Rptr.2d 696, 819 P.2d 436, 467 (1991) (in bank) (allowing "evidence and argument on the specific harm caused by the defendant, including the impact on the family of the victim"). *But see, e.g., State v. Carter*, 888 P.2d 629, 653 (Utah 1995) (prohibiting the introduction of victim impact testimony under Utah's capital felony sentencing statute).

{39} We also conclude that admission of this testimony did not violate Clark's right to due process and a fair trial. "If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment." *Payne*, 501 U.S. at 831, 111 S.Ct. 2597 (O'Connor, J., concurring). Clark correctly recognizes that *Payne* emphasized the extremely brief nature of the testimony, narrow in scope and purpose, offering a "quick glimpse of the life which [the defendant] chose to extinguish," which lessened any potential inflammatory impact on the jury. *Id.* at 830, 111 S.Ct. 2597 (internal quotation marks and citation omitted). Clark argues that the victim impact testimony in his case was lengthy, inflammatory, and unduly prejudicial, entitling him to a new penalty phase. However, the statements of Gore's parents, such as Mrs. Gore's testimony that she would not know what it's like to raise a daughter or enjoy activities with her, were brief and clearly not more inflammatory than the simple facts of Clark's crimes, which include kidnapping and shooting the nine-year-old child in the head. *See id.* at 832, 111 S.Ct. 2597 (noting that "surely [the] brief statement [by the victim's mother describing her grandson's sadness because of the murder of his mother and sister] did not inflame [the jury's] passions more than did the facts of the crime," in which the defendant stabbed the mother 41 times until she bled to death and stabbed his two-year-old sister to death).

{40} Clark argues that the victim impact testimony violates Section 31–20A–4(C)(3), which prohibits capital punishment if "imposed under the influence of passion, prejudice or any other arbitrary factor." The

State counters, and we agree, that Section 31–20A–1(C) permits the jury to hear "additional evidence ... as to the circumstances of the crime," and Section 31–20A–2(B) charges the jury to consider the crime in order to decide the appropriate punishment. The State asserts that victim impact statements convey the harm which Clark caused and is a circumstance of the crime, which the jury should consider when deciding the appropriate punishment. A majority of courts have concluded that victim impact evidence is admissible in death penalty sentencing proceedings, and follow *Payne*. *See Muhammad*, 678 A.2d at 177 (listing cases).

{41} The State lists fourteen witnesses that testified regarding Clark's character, balanced against the testimony of Gore's parents. As Clark is allowed to present witnesses regarding his character, the jury may consider the harm he caused. *See Payne*, 501 U.S. at 826, 111 S.Ct. 2597 (concluding that "there is nothing unfair about allowing the jury to bear in mind [harm to the victims' family] at the same time as it considers the mitigating evidence introduced by the defendant"). "Murder is the ultimate act of depersonalization. It transforms a living person with hopes, dreams, and fears into a corpse, thereby taking away all that is special and unique about the person. The Constitution does not preclude a State from deciding to give some of that back." *Id.* at 832, 111 S.Ct. 2597 (O'Connor, J., concurring) (citation and internal quotation marks omitted). We conclude that the trial court did not err in admitting the testimony of Gore's parents as victim impact evidence.

{42} As Clark notes, Article II, Section 24 of the New Mexico Constitution and NMSA 1978, § 31–26–4(G) (1994), both grant the representatives of a murder victim the right to make a statement to the court at sentencing and at any post-sentencing hearings for the accused, effective in 1992 and 1995, respectively. Clark argues that these provisions do not apply in his case, because he committed the crimes in 1986. Alternatively, he argues that these provisions only allow representatives to make a statement to the judge after a jury has rendered a sentence, not to the jury itself.

{43} The State argues, and we agree, that the application of these provisions to Clark's case would not violate Ex Post Facto prohibitions because introduction of this evidence does not criminalize previously lawful behavior, increase or alter the punishment which Clark could have received, or otherwise affect any substantive right. *See State v. Muhammad*, 145 N.J. 23, 678 A.2d 164, 181 (N.J.1996) ("Because [the victim impact statute] simply modified the scope of evidence that may be admitted during the penalty phase of a capital case and did not alter any substantive rights of defendant, the statute's application to defendant would not violate the State or Federal *Ex Post Facto Clauses*."); *Neill v. State*, 896 P.2d 537, 553 (Okla.Crim.App.1994) ("[Victim impact statutes] did not increase the punishment which the [defendant] was to face, nor did they make criminal an act which was not criminal at the time of its commission; the new statutes were merely procedural."). We also note that Clark's case was not pending at the time the constitutional amendment became effective in 1992 because he exhausted his direct appeals with our opinion in *Clark* in 1989, and his case did not again become pending until this Court granted his habeas relief in 1994. *Cf. State v. Kirby*, 1996-NMSC-069, ¶¶ 7-8, 122 N.M. 609, 930 P.2d 144 (discussing fundamental error in relation to finalization by direct appeal, noting that cases are generally finalized and no longer pending following conviction, sentence, and exhaustion of rights of appeal).

{44} A plain reading of Article II, Section 24 and Section 31–26–4(G) indicate that the victim's family or representatives have the right to make a statement both at sentencing and at any post-sentencing hearings for the defendant. We reject Clark's argument that these provisions prohibit the jury from hearing this type of evidence. To do so, we would have to interpret "at sentencing" to mean only before the judge and not before the sentencing authority, which would render the phrase "post-sentencing hearings" redundant. We believe the Legislature, by using the phrase "at sentencing," intended that the victim's representatives give statements before the sentencing authority as well as at post-sentencing hearings, in order to give effect and meaning to the entire provision. We also believe that the Legislature's use of the term "court" rather than "judge" indicates that these statements should be directed to the sentencing authority. Article II, Section 24 of the New Mexico Constitution and Section 31–26–4 reflect the will of the Legislature and the people of New Mexico, and we assume that the Legislature was aware of *Payne* when it enacted Section 31–26–4. *See State v. Gentry*, 125 Wash.2d 570, 888 P.2d 1105, 1138 (1995) (en banc) ("Although defendants in capital cases have always had substantial due process rights during the sentencing phase of the trial, *the victim also now has constitutional rights* and these must be harmonized with the Defendant's rights." (footnote omitted)).

{45} Victim impact testimony, brief in nature and narrow in scope and purpose, is admissible under Section 31–20A–1(C), as a circumstance of the crime. Thus, we join the majority of states in approving the admission of victim impact evidence in capital cases to the jury. *See e.g., id.* at 1141 & n. 93 (listing cases which have accepted the admission of victim impact testimony).

### 7. Clark's Prior Conviction and Facts of that Crime

{46} Clark's seventh objection is to the trial court's admission of the facts of his prior conviction. The State argues that the trial court properly admitted this evidence to prove the aggravating circumstances of kidnapping and murder of a witness, because the jury is required to unanimously find, beyond a reasonable doubt, at least one of the aggravating circumstances. *See* NMSA 1978, § 31–20A–3 (1979).

{47} The parties stipulated that Clark had been previously sentenced to twenty-four years imprisonment for the kidnapping and criminal sexual penetration of a six-year-old girl, in order to demonstrate that a life sentence for the present matter would require that Clark be incarcerated until at least age eighty-six. Clark reserved his opportunity to assert error only if this prior conviction was subsequently reversed for any reason. Clark also agreed to the second stipulation,

which stated that Clark had abducted the victim as she walked home from school, driven her to an isolated place, and penetrated her vagina with his finger, causing tearing and bleeding. He abandoned her, and she walked to a house for help. She identified Clark from a photo array and made an in-court identification, leading to his conviction. The stipulation instructed the jury that they were to consider this evidence only for the purpose of showing Clark's motive and intent regarding the murder of Gore.

{48} Clark objected to the prosecution presenting the testimony of a police officer which indicated that the victim in the prior case was bleeding from her pelvic area, arguing that the evidence was prejudicial, irrelevant, and inadmissible because he had pleaded guilty in the present case to kidnapping and murder, thus admitting the aggravating circumstance. The prosecution argued that Clark challenged evidence of trauma to Gore's pelvic area during cross-examination of the pathologist, which the prosecution claimed was relevant to show she had been held for sexual services. The trial court inquired whether Clark was willing to stipulate that Gore was held for sexual services, and Clark declined. The trial court ruled that the evidence was relevant to prove motive and that its probative value outweighed its prejudicial impact.

■ {49} The State contends that the evidence regarding the trauma to the victim in the prior case was relevant to show the motive for the kidnapping aggravating circumstance for the present case, because the State must show that Gore was held for service in order to prove kidnapping. *See State v. Vernon*, 116 N.M. 737, 739–40, 867 P.2d 407, 409–10 (1993). The State recounts that, in order to prove Gore was held for service, the prosecution produced the testimony of the pathologist, who opined that there was evidence of sexual activity on Gore's body. On cross-examination, Clark elicited an admission that factors other than injury could have caused the more advanced decay in Gore's pelvis. The State asserts that it was required to prove Clark held her for sexual services to demonstrate the aggravating circumstance of murder during a kidnapping; thus, evidence of Clark's criminal sexual penetration in the prior case was relevant and material because it serves to rebut the defense's evidence that the advanced decay of Gore's pelvic area might have been caused by factors other than a sexual assault. Certainly, the police officer's testimony that the previous victim was bleeding from her pelvic area was not more prejudicial than the facts to which Clark stipulated regarding that case, including that he kidnaped and sexually assaulted a six-year-old child. The State additionally argues that this evidence was admissible as proof of murder of a witness, the other aggravating circumstance, because Clark was convicted as a result of the information that the victim gave to the police, and the logical inference is that he killed Gore to prevent her from identifying him. We agree with the State's arguments, and conclude that the trial court did not err by allowing the State to present testimony regarding Clark's prior conviction. Thus, the trial court did not err by admitting the testimony of the police officer regarding the prior conviction.

{50} Clark, again emphasizing that he stipulated to murder and kidnapping, argues that the trial court should not have allowed the State to introduce evidence of the aggravating circumstances, and that the evidence inflamed the passions of the jury. Clark claims that the crime scene investigation and autopsy testimony and photographs were introduced to "make a jury mad enough to kill." The State notes that Clark did not stipulate that he murdered Gore to prevent her from being a witness against him, and that Clark disputed the evidence with respect to the essential element of kidnapping; in addition, the State relies on the requirement that it prove the two aggravating circumstances beyond a reasonable doubt. The State also asserts that it was allowed to introduce testimony and evidence relevant to the circumstances of the crime. We reject Clark's arguments. As noted in the previous section, we held in *Clark*, 108 N.M. at 298–99, 772 P.2d at 332–33, that the State was not required to present its case in the abstract, and that although Clark pleaded guilty, the State still had to prove beyond a reasonable

doubt that the murder was committed in the course of a kidnapping.

### 8. The Prosecution's Closing Arguments

{51} Clark's eighth argument is that the trial court erred by denying his pre-trial motion to restrict the scope of the State's penalty phase arguments and by failing to sustain his objections to the State's closing argument. Clark believes the State's remarks had a substantial influence on the jury and thus warrants a new sentencing hearing.

{52} This Court has held that:

The prosecution is allowed reasonable latitude in closing argument. The district court has wide discretion to control closing argument, and there is no error absent an abuse of discretion or prejudice to the defendant. If the defense argument raises certain issues, those issues can be discussed by the prosecution. The question on appeal is whether the argument served to deprive defendant of a fair trial.

*State v. Chamberlain*, 112 N.M. 723, 729, 819 P.2d 673, 679 (1991) (citations omitted).

{53} Clark maintains that the State asserted "religious dogma, ... arguing the impact of death of the victim and an appeal to passion." Although Clark does not specify which of the State's statements inserted religious dogma into the proceeding, the State argues that it was responding to Clark's attorney's last statement: "If we ... are to be more Christ-like, ... I ask you: If Christ Jesus sat in this box[,] what do you think he would say?" The State responded, "If Christ Jesus sat in this box, what would he say? ... better you tie a millstone around your neck and be drowned in the sea than to suffer harm to one of these. It's pretty clear what Christ thought about children, and anyone who would harm them." The State notes that Clark relied upon religious themes throughout the case, from his opening statement, through mitigation witnesses, and in his closing, and that the State's response was restrained. The State also notes another remark made in response to Clark's witness's testimony regarding a biblical story. We conclude that the prosecutor's closing statements did not deprive Clark of a fair trial. *See e.g., People v.*

*Mahaffey*, 166 Ill.2d 1, 209 Ill.Dec. 607, 651 N.E.2d 1055, 1068–69 (1995) (noting that the state's brief biblical quotation was invited by and made insignificant by defense's religious references in his argument), *habeas corpus relief conditionally granted on other grounds by Mahaffey v. Page*, 162 F.3d 481, 486 (7th Cir.1998), *cert. denied*, 526 U.S. 1127, 119 S.Ct. 1786, 143 L.Ed.2d 814 (1999).

{54} Clark asserts that the State improperly attacked his defense attorneys by asserting that they had a strategy to circumvent the judicial system and get the governor to pardon him. The State asserts that this remark was in reference to cross-examination testimony that reflected that Clark timed his guilty plea to attempt to take advantage of Governor Anaya's willingness to commute any outstanding death sentence. The State further argues that its remarks were in response to Clark's claims that he had cooperated with authorities by pleading guilty. *See Chamberlain*, 112 N.M. at 730, 819 P.2d at 680 (noting that prosecution's arguments directed at defense counsel "did not impugn the defense personally, but rather were directed at rebutting defense argument"). Again, we conclude that these remarks did not deprive Clark of a fair trial.

{55} Clark argues that the State implied that the death penalty was mandatory by stating that "There are certain crimes that we draw the line and say 'no more.' You have gone too far. Your life is now forfeited. One of those crimes is kidnapping somebody and murdering them." The State counters that the prosecutor told the jury that they must consider aggravating circumstances, mitigation, Clark, and the crime. *Cf. Compton*, 104 N.M. at 688–89, 726 P.2d at 842–43 (rejecting the defendant's argument that the prosecutor's remarks infringed on the jury's sentencing discretion, and holding that the jury clearly understood that it was their responsibility to determine the defendant's sentence). We reject Clark's argument that these remarks implied that the death penalty was mandatory, and we believe that the jury clearly understood that it must decide Clark's sentence based on the evidence regarding the aggravating and mitigat-

ing circumstances, the crime, and Clark. The trial court did not err by denying Clark's pre-trial motion to restrict the scope of the State's penalty phase arguments and by failing to sustain his objections to the State's closing argument.

### 9. Inaudible Tape Record

{56} Clark's next argument is that the tape recorded record is inadequate, particularly with regard to bench conferences, denying him an adequate record in order to perfect his appeal and warranting a reversal. As the State notes, Clark does not specify any avenue of appeal which was lost because of the quality of the record. In *State v. Delgado*, 112 N.M. 335, 345–46, 815 P.2d 631, 641–42 (Ct.App.1991), the defendant apparently made a similarly broad argument as Clark does in the present case, which the Court of Appeals rejected. "Defendant makes no specific claim of prejudice [and] does not contend that the record fails to report prejudicial events and thereby prevents him from raising meritorious issues on appeal." *Id.* Clark makes no persuasive argument that flaws in the record warrant a reversal of his sentence.

### 10. Clark's Motion for a New Trial

{57} Clark's tenth argument is that the trial court erred by failing to grant his motion for a new sentencing hearing, or, in the alternative, failing to grant his motion for a judgment notwithstanding the verdict and for an extension of time. Clark filed the motions post-verdict, making many of the claims he now raises on appeal, including religious discrimination, improper exclusion of evidence regarding mitigating circumstances, improper influence of jurors by passion, prejudice, or other arbitrary factors, and disproportionality of the sentence. Clark also requested that the trial court take judicial notice of the amount of publicity his case received, and noted that other high-profile murder cases occurred in Albuquerque as well as Scotland. Clark also attempted to present affidavits of a defense investigator who allegedly spoke with jurors who were aware of public sentiment regarding his case, and of the unrelated murders.

{58} The State lists the various motions which Clark filed, and notes that he filed a notice of appeal, thus raising questions regarding the trial court's jurisdiction to rule on the earlier motions. Clark filed his motions prior to filing a notice of appeal. It is unnecessary for us to reach the jurisdictional question raised by the State. Even assuming that the trial court retained jurisdiction to rule on Clark's post-sentence motions, the motions were automatically denied thirty days after they were filed. *See* Rule 5–614(C) NMRA 1999. We determine that the trial court did not abuse its discretion in denying these motions. *See State v. Volpato*, 102 N.M. 383, 385, 696 P.2d 471, 473 (1985) ("[A]n order denying a motion for a new trial will not be overturned except for an abuse of discretion.").

### 11. Constitutionality of the Capital Felony Sentencing Act

{59} Although Clark acknowledges that this Court has previously found the Capital Felony Sentencing Act constitutional, he again requests this Court to conclude that the Act is unconstitutional. As discussed below, we uphold the constitutionality of the Capital Felony Sentencing Act.

### A. Cruel and Unusual Punishment

{60} Clark asserts that the Act, both on its face and as applied against Clark, violates the Eighth and Fourteenth Amendments to the United States Constitution and Article II, Section 13 of the New Mexico Constitution because it constitutes cruel and unusual punishment. Clark observes that the State has not executed anyone since the Act became effective in 1979, and that the penalty is rarely given, making it unusual. However, this Court has focused on the nature of the punishment under consideration, rather than the infrequency of its imposition, in assessing the meaning of "unusual." *State ex rel. Serna v. Hodges*, 89 N.M. 351, 355, 552 P.2d 787, 791 (1976), *overruled in part on other grounds by State v. Rondeau*, 89 N.M. 408, 412, 553 P.2d 688, 692 (1976). Clark attempts to persuade this Court that the Act constitutes cruel and unusual punishment by simply asserting that the penalty is illogical,

cruel, uncivilized, against the ideals of Christianity, and not utilized by many other countries. Although Clark argues that capital punishment is obviously "cruel," this Court has stated that "cruel" in this context "prohibit[s] punishments which inflict unnecessary pain or cruelty, torture, or lingering death." *Hodges,* 89 N.M. at 354, 552 P.2d at 790.

{61} Capital punishment for the crime of murder "does not invariably violate the Constitution." *Gregg v. Georgia,* 428 U.S. 153, 169, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). As Clark notes, this Court has also clearly held that capital punishment does not constitute cruel and unusual punishment. *Garcia,* 99 N.M. at 777, 664 P.2d at 975. Clark does not present any argument which convinces us to reconsider this holding.

## B. Capital Punishment Efficacy as a Deterrent

{62} Clark, without support or authority, next argues that the death penalty is not a deterrent to future homicides, and asserts that the State failed to present any evidence that it is a deterrent. As Clark is challenging the constitutionality of the statute, he has the burden of demonstrating that the Act is unconstitutional. "A party challenging the constitutionality of a statute has the burden of proving it is unconstitutional beyond all reasonable doubt." *State v. Duran,* 1998–NMCA–153, ¶ 31, 126 N.M. 60, 966 P.2d 768, *cert. denied,* 126 N.M. 533, 972 P.2d 352 (1998). Clark failed to satisfy this burden. As the State notes, the efficacy of the death penalty in deterring future crime is a matter of continuing debate, and is an issue best left to our Legislature. *See White v. State,* 322 Md. 738, 589 A.2d 969, 974 (1991) ("The General Assembly has made the decision to permit capital punishment under certain circumstances. Assuming the existence of statistical evidence that capital punishment does not serve as a general deterrent, that evidence is best presented to the legislature."). Clark has not demonstrated that the death penalty is not a deterrent to future crime, and, in any case, deterrence does not appear to be a constitutional prerequisite for a criminal penalty deemed appropriate by the Legislature.

## C. Separation of Powers, Due Process and Equal Protection

{63} Section 31–20A–3 directs that if a jury unanimously specifies the death penalty, "the court shall sentence the defendant to death." Without authority, Clark asserts that by enacting Section 31–20A–3, which prohibits trial judges from setting aside a jury's sentence of death, the Legislature violated separation of powers doctrine and denied him due process and equal protection of the laws.

{64} Regarding Clark's separation of powers claim:

It has long been recognized in this state that it is solely within the province of the Legislature to establish penalties for criminal behavior. It therefore follows as a necessary incident of this power that the Legislature has the right to regulate or restrict the circumstances in which courts may suspend sentences in order to ensure the efficacy of those criminal penalties.

*State v. Mabry,* 96 N.M. 317, 321, 630 P.2d 269, 273 (1981) (citations omitted) ("If the doctrine of separation of powers requires anything in this case, it is that the Legislature be allowed to place some restrictions on the ability of the judiciary to avoid imposing legislatively-mandated penalties for crimes by indefinitely suspending sentences").

In a jury proceeding, the jury determines whether to impose the death penalty; the trial judge must abide by this determination. If the sentence is not properly imposed, it is up to the New Mexico Supreme Court to review the sentence. This Court, not the trial judge, automatically reviews the jury's decision to impose the death penalty.

*State v. Guzman,* 100 N.M. 756, 763, 676 P.2d 1321, 1328 (1984). This Court has previously held that this restriction upon the trial judge does not deny a defendant in a capital case due process and equal protection of the law. *State v. Cheadle,* 102 N.M. 743, 744, 700 P.2d 646, 647 (1985). Section 31–20A–3 does not violate separation of powers doctrine and did

not deny Clark due process and equal protection of the laws.

## D. Whether the Statutory Definitions Regarding Mitigation are Constitutional

{65} Clark's next issue regarding the constitutionality of the Act challenges Section 31–20A–6 (mitigating circumstances); he argues that the Act fails to provide any definition for the mitigating circumstances, making the Act vague and indefinite. He further asserts that this section does not provide any standard for the jury to weigh aggravating circumstances against mitigating circumstances, such as requiring a reasonable doubt standard. Clark argues that Section 31–20A–2(B), which directs the jury to weigh aggravating and mitigating circumstances, consider the defendant and the crime, and then determine the sentence, is vague and indefinite, thus violating his due process and equal protection rights. Clark does not support any of these assertions with authority. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) ("Issues raised in appellate briefs which are unsupported by cited authority will not be reviewed by us on appeal.").

{66} In any case, this Court clearly rejected these arguments by Clark during his first direct appeal: "Specific legal standards for balancing aggravating circumstances against mitigating circumstances in a capital sentencing proceeding are not constitutionally required." *Clark*, 108 N.M. at 307, 772 P.2d at 341. Further, this Court "recognized that a subjective standard must be used for this review." *Id.* "While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, the relative *weight* is not." *Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir.1983) (citations omitted), *quoted with approval in Clark*, 108 N.M. at 307, 772 P.2d at 341. Clark asserts that because the Act does not require that the evidence for death outweigh evidence for life beyond a reasonable doubt, it is defective and unconstitutional. Again, we previously rejected this argument. *Clark*, 108 N.M. at 308, 772 P.2d at 342

(rejecting Clark's argument that a capital jury find beyond a reasonable doubt that the penalty of death is the appropriate sentence).

{67} Clark also argues that the Act does not provide this Court with standards for review, and that it thus fails to provide safeguards against arbitrary and capricious results precluded by *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). Clark asserts that the Act fails to provide "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). Clark, again without supporting authority, states that the Act fails to require a sufficient record for this Court to review whether the jury chose the death penalty under the influence of passion or prejudice, or whether the sentence is disproportionate. The State notes that the lack of express findings on mitigation does not lead to unfair or arbitrary results. In *Clemons v. Mississippi*, 494 U.S. 738, 750, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), the Supreme Court concluded that:

> We ... see nothing in appellate weighing or reweighing of the aggravating and mitigating circumstances that is at odds with contemporary standards of fairness or that is inherently unreliable and likely to result in arbitrary imposition of the death sentence. Nor are we impressed with the claim that without written jury findings concerning mitigating circumstances, appellate courts cannot perform their proper role.

We agree, and we thus reject Clark's assertion on this point.

## E. Whether Section 31–20A–6(A) is Unconstitutionally Vague

{68} Clark argues that Section 31–20A–6(A) of the Act, which lists "no significant history of prior criminal activity" as a mitigating circumstance, is unconstitutionally vague and indefinite, and it fails to adequately channel and focus capital sentencing discretion. This Court previously clearly rejected this assertion in *State v. Gilbert*, 100 N.M. 392, 402, 671 P.2d 640, 650 (1983) ("We

are not persuaded that the wording is vague and indefinite as to render Section 31–20A–6(A) unconstitutional."). We reaffirm that holding.

### F. Whether Section 31–20A–6(H) is Constitutional

■ {69} Clark, without supporting authority, argues that Section 31–20A–6(H) (defendant's cooperation with authorities), as considered by the jury as a mitigating factor, violates Clark's right to counsel, right to remain silent, right to a fair trial, and due process of law. Again, we rejected this argument in previous cases, *Guzman,* 100 N.M. at 763–64, 676 P.2d at 1328–29; *Compton,* 104 N.M. at 692, 726 P.2d at 846, and decline to reach a different conclusion in this case.

### G. Whether the Proportionality Review is Constitutional

■ {70} Clark, without supporting authority, next argues that New Mexico's proportionality review, within Section 31–20A–4(C)(4) (requiring this Court to review whether the "sentence of death is excessive or disproportionate to the penalty imposed in similar cases") as supplemented in *Garcia,* 99 N.M. at 780, 664 P.2d at 978 (defining "similar cases" as New Mexico cases where the defendant is convicted of capital murder under the same aggravating circumstance and receives life imprisonment or the death penalty), makes the Act unconstitutional "when there is a danger that it may be wantonly or freakishly imposed." Clark concedes that the United States Supreme Court has held that proportionality review is not mandated by the Federal Constitution. *See Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Clark argues that this proportionality review is inadequate because it does not allow the trial court to determine proportionality (addressed above) and also does not allow this Court to review proportionality in a meaningful manner, which Clark believes would include for review "all cases in New Mexico in which there was evidence of aggravating circumstances, whether or not aggravating circumstances were charged or found, whether or not death or life was imposed."

{71} The State, relying upon *Wyrostek,* 117 N.M. at 519, 873 P.2d at 265, persuasively argues that because proportionality review requires review of the trial record evidence of aggravation and mitigation, this Court cannot review proportionality until this type of evidence is fully developed at the death penalty sentencing hearing; thus, review cannot include cases in which the prosecution did not seek the death penalty. *See State v. Cobb,* 234 Conn. 735, 663 A.2d 948, 955 (1995) (equally divided court); *Smith,* 931 P.2d at 1285 ("A further rationale for limiting proportionality review of other cases to cases in which the death penalty was proposed is that only when the death penalty is sought will a record exist concerning aggravating and mitigating circumstances."). We hold that proportionality review, as contemplated by Section 31–20A–4(C)(4) and *Garcia,* 99 N.M. at 780, 664 P.2d at 978, is not unconstitutional.

### H. Prosecutorial Discretion

■ {72} Again without supporting authority, Clark argues that the death penalty violates Article II, Section 4 and Section 18 of the New Mexico Constitution because of the discretion of prosecutors in determining which cases warrant the death penalty. The State recognizes that many courts have rejected this argument, and that conscientiously exercised prosecutorial discretion is essential to the criminal justice system. *See Gregg,* 428 U.S. at 199, 96 S.Ct. 2909. Although discussed in the now-unconstitutional context of a mandatory death penalty, the reasoning of this Court applies even more aptly for a discretionary death penalty, we noted that prosecutorial discretion, as carried out "by persons who would conscientiously perform their duties in a reasonable way," is necessary for the functioning of the justice system to achieve the "chief objectives [of] justice and grant mercy where merited, by an exercise of judgment, discretion and conscience by a succession of persons or groups with differing skills, backgrounds and viewpoints." *Hodges,* 89 N.M. at 358, 552 P.2d at 794. In the context of proportionality review, the Supreme Court noted that

the strength of the available evidence remains a variable throughout the criminal

justice process and may influence a prosecutor's decision to offer a plea bargain or to go to trial. Witness availability, credibility, and memory also influence the results of prosecutions. Finally, sentencing in state courts is generally discretionary, so a defendant's ultimate sentence necessarily will vary according to the judgment of the sentencing authority. The foregoing factors necessarily exist in varying degrees throughout our criminal justice system.

*McCleskey v. Kemp*, 481 U.S. 279, 307 n. 28, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Thus, we hold that the necessary and unavoidable discretion of prosecutors does not violate the New Mexico Constitution.

## 12. Proportionality Review

{73} Clark requests that this Court review his sentence in order to determine if capital punishment is excessive or disproportionate to the penalty imposed in similar cases, pursuant to Section 31–20A–4(C)(4). First, Clark asks us to reconsider the standards for proportionality review articulated in *Garcia*, 99 N.M. at 780, 664 P.2d at 978.

{74} "[P]roportionality review is a post-sentence inquiry, undertaken to identify disparities in capital sentencing and to prevent the death penalty from being administered in an arbitrary, capricious, or freakish manner." *Wyrostek*, 117 N.M. at 522, 873 P.2d at 268. Under Section 31–20A–4(C)(4), "[t]he death penalty shall not be imposed if . . . the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." This Court adopted the following guidelines, sometimes referred to as a precedent-seeking approach, regarding proportionality:

1. We will review this issue only when raised on appeal.

2. In our review, we will consider only New Mexico cases in which a defendant has been convicted of capital murder under the *same aggravating circumstance(s)*.

3. Only those New Mexico cases in which a defendant was convicted under the same aggravating circumstance(s) and then received *either* the death penalty *or* life imprisonment and whose conviction and sentence have been upheld previously by this Court, will be considered appropriate for comparison.

4. We will review the record and compare the facts of the offense and all other evidence presented by way of aggravation or mitigation to determine whether the sentence is excessive or disproportionate.

*Garcia*, 99 N.M. at 780, 664 P.2d at 978 (footnote omitted).

{75} Clark asks this Court to adopt New Jersey's statistical frequency procedure for review, articulated in *State v. Marshall*, 130 N.J. 109, 613 A.2d 1059, 1071 (1992) (per curiam), which defined the "universe" of comparison cases as including all deliberate intent murders in which some evidence supports the allegation of an aggravating factor regardless of whether the case proceeds to capital sentencing. Clark then asks this Court to direct the State to compile data for comparison. Finally, Clark requests more detailed guidelines concerning how comparison cases are chosen.

{76} Clark fails to reveal that in *State v. DiFrisco*, 142 N.J. 148, 662 A.2d 442, 454–60 (1995), the New Jersey Supreme Court concluded that the procedure used in *Marshall* produced unreliable results due to the small sample size of homicides that occurred in that state which could have been death penalty eligible, and instead relied primarily upon a New Mexico-type review. *See State v. Cooper*, 159 N.J. 55, 70, 731 A.2d 1000, 1008 (1999) ("In our prior proportionality review decisions we have found it appropriate to place greater reliance on precedent-seeking review than on frequency analysis, noting that the process of precedent-seeking review is one familiar to us as judges and is not vulnerable to the concerns about reliability that burden frequency analysis."). Apparently, no state employs the approach urged by Clark. *See State v. Bland*, 958 S.W.2d 651, 664 n. 12 (Tenn.1997) (noting that no state has only a frequency method approach; the two states that use some form of a frequency approach also engage in a precedent-seeking approach), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998). We reject Clark's request to adopt a frequen-

cy method approach, and continue to apply the guidelines set out in *Garcia.*

{77} Clark argues that the death sentence in his case is excessive and disproportionate. Clark notes that former Governor Anaya commuted the death sentences of five men during his term, and asserts that Anaya would have commuted Clark's sentence if he had been given the opportunity. Clark, without authority or supportable assertions from the record, asks this Court to consider this issue on equal protection grounds. In the context of proportionality review, we concluded that "[b]ecause Defendant asserts no facts that indicate his equal protection rights are being violated, these issues are not properly presented for review and will not be addressed on appeal." *Wyrostek,* 117 N.M. at 523, 873 P.2d at 269; *see also State v. Lawson,* 310 N.C. 632, 314 S.E.2d 493, 500–01 (1984) (determining that the defendant's equal protection arguments were without merit when the defendant failed to show that the prosecutor sought the death penalty based on "unjustifiable standards like 'race, religion or other arbitrary classification' "), *cited with approval in Wyrostek,* 117 N.M. at 523, 873 P.2d at 269. Because Clark does not indicate any factual support for discrimination on the basis of a suspect classification or irrational state action, we reject his argument.

{78} Clark has properly raised the issue of proportionality for appeal. Clark offers the affidavit of Appellate Public Defender Susan Gibbs in support of his assertion that his sentence is disproportionate. This Court must compare New Mexico cases in which a defendant was convicted under the same aggravating circumstances as Clark, murder during the course of a kidnapping and murder of a witness, and in which the comparison defendant received either the death penalty or life imprisonment and whose conviction and sentence have been upheld by this Court. The State inexplicably attempts to remove some comparison cases which the defendant presents, but, after reviewing prior cases from this Court which completed a proportionality review, these cases appear to be appropriate.

{79} The first comparison case is *Guzman,* 100 N.M. 756, 676 P.2d 1321. The defendant received a death sentence after the jury found the aggravating circumstances of murder committed during the commission of a kidnapping, murder during the commission of criminal sexual penetration, and murder of a witness to a crime. *Id.* at 760, 676 P.2d at 1325. In the second case, *Gilbert,* 100 N.M. at 395, 671 P.2d at 643, the defendant received the death sentence after the jury found the aggravating circumstances of two counts of murder committed during the commission of a kidnapping and murder of a witness to a crime, and this Court affirmed. A third case, *State v. Cheadle,* 101 N.M. 282, 681 P.2d 708 (1983), as the State points out, seems to be an unreliable comparison case because the sentence was later overturned due to ineffective assistance of counsel. *See State v. Cheadle,* 106 N.M. 391, 391, 744 P.2d 166, 166 (1987). Finally, in both *State v. Hutchinson,* 99 N.M. 616, 619 n. 1, 625, 661 P.2d 1315, 1318 n. 1, 1324 (1983), and *McGuire,* 110 N.M. at 306, 314, 795 P.2d at 998, 1006, the jury found the aggravated circumstances of murder in the commission of a kidnapping and murder of a witness, and this Court affirmed the life sentence of the respective defendants.

{80} Compared to these cases, we conclude that Clark's sentence was not administered in an arbitrary, capricious, or freakish manner. Both *Gilbert* and *Guzman* involved similar aggravating circumstances: murder committed during the commission of a kidnapping and murder of a witness. *Guzman* involved an additional aggravating circumstance and *Gilbert* involved two victims. Although the respective defendants in *Hutchinson* and *McGuire* received life sentences for similar aggravating circumstances, that does not indicate that Clark's death sentence is freakish, arbitrary, or capricious. *See Bland,* 958 S.W.2d at 665 (noting that "it is clear that our function in performing comparative review is not to search for proof that a defendant's death sentence is perfectly symmetrical, but to identify and invalidate the aberrant death sentence"). One significant difference between Clark's crime and these other four cases, which involved adult

victims, is the age of Gore. We hold that there is no disparity in Clark's sentence.

{81} This Court also reviews the record and compares the facts of the offense and all other evidence presented by way of aggravation or mitigation to determine whether the sentence is excessive or disproportionate. *See* § 31–20A–4(C); *Garcia,* 99 N.M. at 780, 664 P.2d at 978. Clark presented testimony of various individuals describing Clark as remorseful and describing their relationships with him, including Robert DeVoe, William Fry, Steve Aarons, Terry Kinney, John Southerland, Paul Collins, and Austin Bonner. Clark also made a statement to the jury in which he requested that it sentence him to life imprisonment, stated that he was sorry for his crimes, and asked that they consider the impact of a sentence of death on his children and fiancee.

 {82} The State presented ample evidence supporting the aggravating circumstances in this case. The jury listened to Clark's guilty plea proceedings, in which Clark described how he kidnaped Gore, forcing her into his car, and struck her repeatedly. Clark recounted that he drove her to his brother's ranch and tied Gore's hands to restrain her. The State notes that Gore was nine years old at the time of her murder, and that the police discovered Gore's body naked, bound at the wrists and ankles, and shot three times in the back of the head at close range. The State informed the jury of Clark's prior conviction for kidnapping and criminal sexual penetration of a six-year-old child. These facts overwhelmingly support both the aggravating circumstances of murder committed during the commission of a kidnapping and murder of a witness. This evidence also supports the jury's findings that the aggravating circumstances outweighed the mitigating circumstances. The State argues, and we agree, that the facts are egregious in Clark's case. These circumstances unquestionably outweigh Clark's testimony and the testimony of his friends and

relatives describing his remorse and positive characteristics.

{83} Although Clark observes that other high-profile murders occurred near the time of his sentencing, the simple details of his crimes provide ample basis for the jury's determination. Similarly, Clark again argues that the brief victim impact testimony of Gore's parents inflamed the jury, but, as Justice O'Connor expressed, "surely [the] brief statement did not inflame [the jury's] passions more than did the facts of the crime." *Payne,* 501 U.S. at 832, 111 S.Ct. 2597 (O'Connor, J., concurring). The facts of Clark's case support the conclusion that the jury did not impose his death sentence under the influence of passion, prejudice, or any other arbitrary factor. Taking Clark, the circumstances of the crime, and other similar New Mexico cases into consideration, we conclude that Clark's sentence of death was neither excessive nor disproportionate.

### 13. Waiver

 {84} Finally, Clark, pro se, requests this Court to consider whether he may waive appellate review of his case. Clark argues that the Supreme Court held that a defendant may waive representation of legal counsel in *Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) and that a defendant may waive his or her right to appeal if the waiver is knowing, voluntary, and intelligent, and made with full knowledge of his or her rights. *See Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976).

{85} The Legislature, pursuant to Section 31–20A–4(A), requires this Court to review the judgment of conviction and sentence of death automatically. Thus, this Court must engage in a direct review of Clark's sentence.

{86} Similarly, many appellate courts have held that a capital defendant may not waive any aspect of direct appellate review of their sentences.[2] Other states have held that

---

2. *See State v. Brewer,* 170 Ariz. 486, 826 P.2d 783, 791 (1992) (en banc) (holding that the defendant may not restrict the mandatory appeal provided for him pursuant to the state's capital-sentencing procedures because doing so would

be a renunciation of the court's duty imposed by the statutes and rules of criminal procedure); *Massie v. Sumner,* 624 F.2d 72, 74 (9th Cir.1980) (holding that California has an important interest in accuracy and fairness in its criminal proceed-

capital defendants may waive general appellate review, while still engaging in statutory review of the death sentence.[3] A minority of states have held that a capital defendant may waive appellate review, but still require review of the trial court's determination that the defendant made a knowing, voluntary, and intelligent decision.[4] We conclude that the Legislature intended to require meaningful review of a death sentence by this Court.

{87} However, following a competency hearing or other evidence of competency, we believe that Clark may knowingly, voluntarily, and intelligently waive his right to further review of his case beyond this Court's direct review of his sentence. *See Gilmore,* 429 U.S. at 1017, 97 S.Ct. 436 (Burger, C.J., concurring) (noting, in a habeas proceeding, that "Gilmore, duly found to be competent by the Utah courts, has had available meaningful access to this Court and has declined expressly to assert any claim here other than his explicit repudiation of [his mother's] efforts to speak for him"); *Whitmore v. Arkansas,* 495 U.S. 149, 165, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (rejecting fellow capital defendant's attempt to intervene, and noting that the state supreme court requires review of the trial court's determination, made following a hearing, that the defendant made a knowing, voluntary,

and intelligent waiver of his right to appeal); *Franklin v. Francis,* 168 F.3d 261, 262 (6th Cir.) (per curiam) (denying stay of execution, noting that the Ohio Supreme Court had previously concluded that capital defendant was competent to waive collateral review, and thus, the federal district court did not have jurisdiction to hear the petition for writ of habeas corpus by the next friend of the defendant), *cert. denied,* 525 U.S. 1132, 119 S.Ct. 1022, 142 L.Ed.2d 973 (1999); *Baal v. Godinez,* 737 F.Supp. 77, 78 (D.Nev.1990) (noting that testimony and evidence established that the defendant was legally competent, and denying parents' application for stay, holding that the capital defendant, wishing to proceed pro se, made a knowing, intelligent, and voluntary waiver regarding his right to request a stay of execution), *stay vacated by Demosthenes v. Baal,* 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990).

### Conclusions

{88} The trial court, which is in the best position to assess a juror's demeanor and credibility, may properly exclude a juror for cause if the juror's views would substantially impair the performance of the juror's duties in accordance with the instructions and oath. Because there was not a clear abuse of dis-

---

ings that outweighs the defendant's right to self-representation, where the defendant challenged the validity of California's statutory automatic appeal for death sentences by habeas petition, contending that his incarceration on death row pending determination of the forced and unwanted appeal constitutes cruel and unusual punishment and violates his right to refuse counsel); *Klokoc v. State,* 589 So.2d 219, 221–22 (Fla.1991) (per curiam) (holding that a capital defendant must receive a meaningful appeal, with the benefit of an adversary proceeding with diligent appellate advocacy addressed to both the judgment and the sentence, but allowing the defendant to file a pro se supplemental brief setting forth his personal positions and interests with regard to the subject matter of this appeal).

**3.** *See State v. Dodd,* 120 Wash.2d 1, 838 P.2d 86, 95 (1992) (en banc) (reviewing a defendant's wish to waive his general appeal with the understanding that he could not waive statutory review, following determination that he was competent and his decision to waive his general right of appeal was made knowingly and voluntarily); *see also State v. Sagastegui,* 135 Wash.2d 67, 954

P.2d 1311, 1320 (en banc), *dismissal of post-conviction relief reversed by Vargas v. Lambert,* 159 F.3d 1161 (9th Cir.), *stay vacated,* 525 U.S. 925, 119 S.Ct. 313, 142 L.Ed.2d 274 (1998).

**4.** *See State v. Berry,* 74 Ohio St.3d 1504, 659 N.E.2d 796, 796 (1996) (holding that "[a] capital defendant is mentally competent to abandon any and all challenges to his [or her] death sentence, including appeals, state post-conviction collateral review, and federal habeas corpus, if he [or she] has the mental capacity to understand the choice between life and death and to make a knowing and intelligent decision not to pursue further remedies"); *Grasso v. State,* 857 P.2d 802, 806 (Okla.Crim.App.1993) (noting that direct appellate review of capital cases is not mandated by statute); *Franz v. State,* 296 Ark. 181, 754 S.W.2d 839, 843–44 (1988) (noting that an appeal is not mandated by statute, holding that following a finding that the capital defendant is competent, he or she may knowingly and intelligently waive any and all appeals; the state supreme court will then review the trial court's determination of whether the defendant competently, knowingly, and intelligently waived his or her right to appeal).

cretion or a manifest error in this case, we will not disturb the trial court's decision. The trial court's removal for cause of jurors in Clark's case was based on their inability to apply the law and follow the jury oath. The fact that the potential juror's inability to perform his or her duty is based upon religious objection and belief does not violate the religious protections of the New Mexico Constitution, because exclusion from the jury was not based upon religious affiliation. The trial court did not abuse its discretion by allowing the State to question potential jurors whether they could sign a death verdict and announce this finding in court. Further, the trial court did not err in denying Clark's objection to the State's use of peremptory challenges to remove potential jurors who are reluctant to impose capital punishment.

{89} Proportionality review is clearly a matter for this Court; thus, the trial court did not err in restricting Clark's offer of proportionality evidence. Additionally, the trial court did not err by refusing to allow Clark to present evidence regarding particular individuals' opinions about the death penalty because such evidence does not bear upon Clark's character, prior record, or the circumstances of his crimes. The trial court did not err by admitting testimony and evidence which related directly to the circumstances of Clark's crime, the testimony of Gore's parents as victim impact evidence, and evidence of Clark's prior conviction.

{90} The trial court did not err by denying Clark's pre-trial motion to restrict the scope of the State's penalty phase arguments and by failing to sustain his objections to the State's closing argument. Clark makes no persuasive argument that flaws in the record warrant a reversal of his sentence. The trial court did not err by failing to grant Clark's motion for a new sentencing hearing, or by failing to grant his motion for a judgment notwithstanding the verdict and for an extension of time.

{91} We uphold the constitutionality of the Capital Felony Sentencing Act. The evidence supports the jury's findings of the aggravating factors charged. The evidence also supports the jury's findings that the aggravating circumstances outweighed the mitigating circumstances. The facts of Clark's case support the conclusion that the jury did not impose his death sentence under the influence of passion, prejudice, or any other arbitrary factor. Taking Clark, the circumstances of the crime, and other similar New Mexico cases into consideration, Clark's sentence of death was neither excessive nor disproportionate. We affirm Clark's sentence. Finally, we conclude that this Court is required to directly review Clark's sentence of death, though we believe that, if he is competent, he may knowingly, voluntarily, and intelligently waive his right to any further review of his case.

{92} **IT IS SO ORDERED.**

MINZNER, C.J., BACA, and MAES, JJ., concur.

FRANCHINI, Justice (specially concurring).

FRANCHINI, Justice. (Special Concurrence)

{93} I **CONCUR** in both the analysis and result reached in this opinion because it is legally correct. It is also solidly based on the precedents of this court as well as other federal and state courts.

{94} I write specially to state that I am opposed philosophically and practically to the death penalty. I personally believe it to be a bad public policy. However, public policy is solely within the legislature's domain and this court is powerless to change it unless the statutory law underlying the policy is declared unconstitutional.

{95} For the reasons set out in the opinion, the arguments advanced by the defendant do not convince me or the court that the death penalty statute in New Mexico is unconstitutional. However, those same arguments firmly convince me personally how truly flawed such a public policy is.

{96} Since it is the duty and responsibility of a judge to interpret and apply the law to the facts of a case free of any personal or philosophical leanings or beliefs, I specially concur.