NAKAMURA, Chief Justice (dissenting).
{144} The Majority's position-executing Fry and Allen would be immoral, unethical, and unjust given the rarity with which murderers in New Mexico are put to death-has appeal at some very basic level. But I must respectfully dissent. I do not know if executing Fry and Allen would be immoral, unethical, or unjust. I know only that a jury comprised of women and men from our state concluded that Fry and Allen forfeited their right to continue living among us for brutally killing innocent and by all accounts gentle and caring women. I am certain also that the jurors assembled to sentence Fry and Allen took their responsibilities to decide Fry's and Allen's fate with the gravity and seriousness the task required.
{145} The legislative command that this Court assure that Fry's and Allen's death sentences are not "disproportionate to the penalty imposed in similar cases" should not be construed in the way embraced by the Majority. Section 31-20A-4(C)(4) (1979, repealed 2009). They perceive in that language authority to conclude that, because so few *1127 offenders in New Mexico have ever been sentenced to die, no offenders shall ever again be sentenced to die in New Mexico. I respectfully contend that the Majority's judgment is error.
{146} Our Legislature created a refined category of death-eligible crimes and gave to capital-sentencing juries guided discretion to decide the fate of those who offend community norms in the most egregious ways. These facts must play some role in our construction of Section 31-20A-4(C)(4). State v. Garcia , 1983-NMSC-008, 99 N.M. 771, 664 P.2d 969, does this and correctly construed that language to require us to do no more than evaluate whether there is some precedent for the death sentence and to assure ourselves that the sentence is not excessive in light of the nature of the crime. To do anything more than this intrudes upon the capital-sentencing jury's rightful, constitutional authority to extend mercy or impose death.
{147} The Majority strays beyond the limited authority granted us under Section 31-20A-4(C)(4) and overrules the decision of previous members of this Court on inescapably subjective questions. They do this despite the fact that there has been no change in the law since the proportionality of Fry's and Allen's death sentences were previously considered, and there have been no inroads made about how to measure the proportionality of any given death sentence.
{148} The legislative repeal of the death penalty is not support for the Majority's arguments or outcome. The repeal was achieved through a compromise that required Fry and Allen to submit to their death sentences. It in no way suggests the Legislature has doubts about our comparative proportionality methodology or our assessment of the proportionality of Fry's and Allen's death sentences.
{149} These general thoughts guide this dissent. In what follows, I explain my position in much greater detail. A series of preliminary points are addressed first to dispose of several arguments the Majority makes and that are irrelevant to the statutory and constitutional questions at issue here. Discussion there follows.
I. PRELIMINARY POINTS
A. Sentence Versus Execution
{150} The Majority emphasizes that only one individual has been executed in New Mexico since the enactment of the Capital Felony Sentencing Act (CFSA). Maj. Op. ¶¶ 28, 35, 37, 93, 109; Concurrence ¶¶ 140-141. This is inapposite. We must determine if the "sentence of death" in any particular case is "disproportionate." Section 31-20A-4(C)(4) (emphasis added). Our focus is on the "sentence" imposed and not on whether the individual sentenced to die is actually executed.
B. "Heinous Crimes" and "Aberrant" Juries
{151} The Majority focuses on whether Fry's and Allen's crimes were "the most heinous" and whether their juries acted "aberrantly" by imposing death sentences. See Maj. Op. ¶¶ 1, 17, 66, 71, 73, 77, 90 n.22, 97, 102, 119, 120. The words "most heinous" and "aberrant" are not value neutral and inject normative considerations into this matter in a way that is troubling and problematic.
{152} The CFSA does require us to consider whether sentencing disparities have occurred in the capital context. But this is a task very different than that in which the Majority is engaged. They are asking whether Fry's and Allen's crimes were sufficiently "heinous" to justify their death sentences and whether their juries' decisions to impose the death penalty were "aberrant." This is error. We are not and should never attempt to be "finely tuned calibrator[s] of depravity, demarcating for a watching world the various gradations of dementia that lead men and women to kill their neighbors." Godfrey v. Georgia , 446 U.S. 420, 456 n.6, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (White, J., dissenting). The language the Majority employs and the analysis in which it engages indicates that this is precisely what they are doing.
C. Gregory and Race-Based Imposition of Capital Punishment
{153} The Majority states that we are here "faced with similar concerns regarding proportionality *1128 review" that prompted the Washington Supreme Court in State v. Gregory , 192 Wash.2d 1, 427 P.3d 621 (Wash. 2018), to declare that its capital punishment statute violates Washington's state constitution. Maj. Op. ¶ 41. In Gregory , the evidence indicated that black defendants were four-and-a-half times more likely than white defendants to be sentenced to death in the state of Washington. 427 P.3d at 630. The Washington Supreme Court was satisfied that "the association between race and the death penalty" could not be "attributed to random chance" and concluded that Washington's capital-punishment system is constitutionally intolerable as it is racially biased. Id. at 635-36. The court addressed comparative proportionality review only insofar as the court was unpersuaded that it was a tool capable of ameliorating the broad and fundamental discrimination worked by Washington's capital-punishment statute. Id. at 637. Comparative proportionality review, the court explained, was simply too subjective and too case-specific to adequately "fix the constitutional deficiencies" confronted. Id. The concerns underlying Gregory are not at all present here.
{154} To the best of my knowledge, only one author has been willing to suggest that, in New Mexico, "race and ethnicity play[ ] a role in determining who w[ill] live and who w[ill] die." Marcia J. Wilson, The Application of the Death Penalty in New Mexico, July 1979 Through December 2007: An Empirical Analysis , 38 N.M. L. Rev. 255, 283 (2008). That author made clear, however, that her observations were not the result of professional, statistical inquiry and she conceded that the data she reviewed and the methodologies she employed to review it "do[ ] not 'statistically prove' anything." Id. at 259-60. The State Bar of New Mexico, Task Force to Study the Administration of the Death Penalty in New Mexico, Final Report, 18 (Jan. 23, 2004), discusses evidence that race plays some role in the imposition of the death penalty nationally, see id. at 13, but the report does not claim that race plays a factor in death sentencing in New Mexico. See id. at 14-15.
{155} There is no evidence that Fry's and Allen's death sentences were imposed as a consequence of Fry and Allen's race or the race of their victims. Fry and Allen are both white, non-Hispanic; Fry's victim was a woman of mixed ethnicity and was part Navajo, and Allen's victim was white, with no evidence that she was an ethnic minority. We are not presented here with circumstances equivalent to those the Supreme Court of Washington confronted in Gregory . This case is different.
II. DISCUSSION
{156} The question here is whether the Court should overturn the judgment of previous members of this Court who concluded that Fry's and Allen's death sentences are not comparatively disproportionate. We should not for the following reasons: (A) the capital sentences imposed by Fry's and Allen's respective sentencing juries were neither excessive nor disproportionate given the facts and severity of Fry's and Allen's crimes; (B) the parties did not ask us to reconsider Garcia ; (C) the Majority misinterprets the federal constitutional principles it cites as grounds compelling reconsideration of Garcia ; (D) competing concerns within the CFSA counsel against the revised approach to comparative proportionality review embraced by the Majority; (E) Garcia correctly construed Section 31-20A-4(C)(4), it was sensibly applied in Fry's and Allen's cases, and that construction is entitled to deference under stare decisis; and finally, (F) revisiting the comparative proportionality of Fry's and Allen's death sentences violates principles of finality.
A. The Facts and Severity of Fry's and Allen's Cases
{157} It is essential to begin with the facts of Fry's and Allen's crimes because proportionality review "is first and foremost directed to the particular circumstances of a crime and the specific character of the defendant." Garcia , 1983-NMSC-008, ¶ 40, 99 N.M. 771, 664 P.2d 969. It is also settled law that the question whether any given death sentence is comparatively disproportionate cannot be assessed unless and until all of the facts that *1129 gave rise to the sentence-the "baseline" for comparison-are thoroughly understood. State v. Addison , 160 N.H. 732, 7 A.3d 1225, 1253 (N.H. 2010) ; State v. Guzman , 1984-NMSC-016, ¶ 33, 100 N.M. 756, 676 P.2d 1321. This requires scrutiny of the entire record including the aggravating and mitigating circumstances presented to the capital-sentencing jury. See Addison , 7 A.3d at 1253 ; State v. Wyrostek , 1994-NMSC-042, ¶ 12, 117 N.M. 514, 873 P.2d 260.
1. The facts of Fry's case
{158} On the night of June 8, 2000, Fry bragged to companions that he was "wearing an eight-inch bowie knife" and intended to "stick someone." Fry encountered Betty Lee, a woman in her thirties and a mother of five, by pure chance at a convenience store at approximately 2:00 a.m. on June 9, 2000. Fry and Betty had never met before.
{159} Betty was using a pay phone, was emotionally distraught, and stranded. Fry was driving a vehicle and was accompanied by one male companion, Leslie Engh. Fry offered Betty a ride home, and she accepted.
{160} Fry drove away from the store with Betty and Engh and turned off the paved roadway and onto a dirt road that led out into the desert. Fry claimed that he needed to urinate and drove a "pretty good" distance away from the paved road. Betty sensed something was not right, and when Fry stopped the car, exited, and began urinating, she also exited the vehicle and began walking back towards the paved road. Fry reentered his vehicle, drove alongside Betty, and coaxed her back in.
{161} After Betty reentered the car, Fry drove some distance further, then stopped, and dragged Betty out of the car by her hair. A struggle ensued and Fry summoned Engh to hold Betty's legs, which Engh did. Fry then attempted to take off Betty's shirt, but she kicked him. Fry drew his bowie knife and "slammed" it into Betty's chest. The knife traveled two inches into Betty and penetrated her breast bone and heart sac. She fell to the ground and Fry and Engh attempted to pull off her pants. As they did this, Betty yelled at the men "why are you doing this to me?" She then removed the knife from her chest, threw it into a ravine, broke free, got to her feet, and started running.
{162} As she ran, Betty screamed loudly at a high pitch. Her shirt was around her neck and her chest exposed. Fry chased her, caught her, and then the two men succeeded in pulling off her pants. After they disrobed her, Betty once more broke free and again started running. At this point, she was completely naked.
{163} Fry instructed Engh to find the knife and Fry obtained a sledgehammer from the car. As Engh searched in bushes with a flashlight for the knife, he saw Fry swinging the sledgehammer in the distance. Betty's screaming came to an end.
{164} Fry struck Betty on the head three to five times with the sledgehammer. The wounds the blows inflicted indicated that Betty had been facedown on the ground when she was struck. Her scalp was torn, her skull split, and her brain lacerated. These blows, in conjunction with the stab wound, caused her death.
{165} After Fry killed Betty, Fry and Engh dragged her corpse by its wrists to some bushes by a ravine, an area where they believed it would not be discovered. Engh did not want to look at the corpse but did and saw that the face was covered in blood and the hair was "in all sorts of different funny directions." They kicked Betty's clothes "off towards the edge of the ravine" so that they too would not be discovered.
{166} Fry and Engh drove away from the scene of the murder, but their car became stuck in "a wash." Fry contacted his parents on his cell phone. It was nearly 4:00 a.m. Fry's parents, oblivious to what Fry and Engh had just done, met the men at the paved roadway.
{167} Betty's corpse was discovered by a lineman later that morning. When questioned by the police, Fry denied any involvement in the killing. He did not testify at trial. The evidence presented to Fry's jury overwhelmingly demonstrated that Fry had killed Betty. Engh testified as a witness for the State and provided the testimony that serves as *1130 the principal foundation for the narrative produced above.
{168} After Fry's jury returned a guilty verdict, several of Betty's siblings and children offered victim impact testimony at the sentencing phase of the proceedings. The general thrust of that testimony was that Betty had been a kind and generous woman, that Betty's family was greatly distressed by the thought of the terror she experienced at the time of her death, and that the family's grieving and loss was profound. The sole aggravating circumstance found by the jury was that Fry perpetrated his murder in the course of a kidnapping. State v. Fry , 2006-NMSC-001, ¶ 6, 138 N.M. 700, 126 P.3d 516.
{169} Four witnesses presented mitigating evidence for Fry. Id. ¶ 46. A psychologist stated that it was unlikely Fry would engage in additional violence in prison. A pastor stated his belief that Fry had grown spiritually since being incarcerated. Fry's mother and father indicated a desire to continue knowing their son and spoke of his interests and community involvement. The trial judge informed the jury that, if Fry received a prison sentence for his crimes, he would be imprisoned for a minimum of sixty-seven years.
2. The facts of Allen's case
{170} On February 7, 1994, Allen happened to encounter Sandra Phillips as Sandra walked through Flora Vista, New Mexico to complete an errand and apply for a job at a local restaurant. State v. Allen , 2000-NMSC-002, ¶ 2, 128 N.M. 482, 994 P.2d 728. They did not know each other. At that time, Sandra was seventeen years old and had just moved home to live with her mother. Allen thought Sandra was "cute" and "good looking," and he "liked her red hair." Allen and Sandra spoke and then, for reasons unknown, Sandra entered Allen's truck.
{171} Allen drove Sandra out into the hills "because he wanted to make love to her." He tied a rope around Sandra's neck "so he could control her while he made love to her." Initially, the rope was wrapped around Sandra's neck three times and then knotted. Allen tightened the rope to a point that it cut off the blood supply to Sandra's brain. Sandra struggled with Allen for about thirty seconds as he attempted to rape her, but she lost consciousness and went limp. Allen pulled Sandra's blouse over her chest, removed Sandra's left boot, and then removed Sandra's left leg from her pants and underwear. Even though Sandra was unconscious, she was still breathing. Allen wrapped the rope around her neck a fourth time and again knotted it. Sandra died one to two minutes after losing consciousness. She was slowly strangled to death. In the course of the struggle, Allen sustained a facial scratch and a bruised lip. Id. ¶ 5.
{172} After murdering Sandra, Allen put her half-naked corpse in a ditch three-and-one-half miles from Flora Vista. Id. ¶ 3. The evidence indicated that the killing occurred somewhere other than where the body was discovered. Id. ¶ 7. Allen cleaned his truck to eliminate any evidence of the murder. Sandra's corpse remained in the ditch until it was discovered by a shepherd six weeks later. Id. ¶ 3. The jury was shown sixteen photographs of Sandra's half-naked, decaying corpse.
{173} When the police informed Allen that they suspected he killed Sandra, Allen informed them that the perpetrator was, in fact, a man named David Anderson from Jemez Springs. Yet, Allen told his wife and others that he raped and then killed Sandra in order to prevent her from reporting the rape and expressed to others that he thought he would not be convicted for the crime.
{174} At the sentencing phase, the jury learned that Allen had taken measures to silence other women he had victimized. The jury was informed that, in the 1980s, Allen stole money from a woman and, when she confronted him about the theft, he grabbed her by the throat, pushed her against a wall, and threatened to kill her if she reported the incident to the police. Allen was imprisoned for this conduct. Id. ¶ 80. This testimony in conjunction with Allen's statements to his wife and others that he raped Sandra and then killed her to prevent her from reporting the rape formed the basis for the jury's finding that Allen killed Sandra with the aggravating circumstance that he murdered *1131 to silence a witness. Id. ¶¶ 79 -80. At the sentencing hearing, Sandra's mother and a family friend testified, and a short video of Sandra on a camping trip was played for the jury. Id. ¶¶ 56 -58. This evidence was, by all accounts, particularly forceful and established that Allen's actions irreparably wounded Sandra's family and friends. See id. at ¶ 145 (Franchini, J., partial concurrence and partial dissent).
{175} Allen also spoke to the jury at sentencing. Id. ¶ 82. He offered mitigating evidence on his own behalf, the only mitigating evidence presented. Id. He "sobbed," "cried," and told the jury "he was sorry for the pain he had caused."
B. The Parties Did Not Ask Us to Reconsider the Merits of Garcia
{176} Neither Fry nor Allen raised the issue of the validity of the comparative proportionality methodology embraced in Garcia until this Court directed them to do so. Fry and Allen argued that executing them after the legislative repeal of the death penalty would constitute cruel and unusual punishment in violation of the Eighth Amendment and deprive them of the equal protection of law. The Court declined to answer these questions and, instead, directed the parties to submit briefs about the merits of Garcia and the merits of this Court's application of the principles articulated in Garcia in Fry's and Allen's direct appeals. This is troubling.
{177} "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." Carducci v. Regan , 714 F.2d 171, 177 (Scalia, Circuit Justice, D.C. Cir. 1983) (opinion for the court by Scalia, J.). "[W]e follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." Greenlaw v. United States , 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008). "[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties." Id. at 244, 128 S.Ct. 2559 (internal quotation marks and citation omitted).
{178} I am not arguing that this Court is without power to independently exercise its authority and decide questions not briefed when it is prudent and necessary to do so. I have advocated for and have done just this. Rather, I contend that we should not reach issues not raised by the parties and not implicated by their arguments. And this is particularly true where doing so requires us to reverse the decisions of prior members of this Court on questions that are, as will be shown, inescapably subjective and based on settled law.
C. Federal Constitutional Principles
{179} The Majority justifies its decision to direct this litigation to Garcia and comparative proportionality review because, in their view, the construction of Section 31-20A-4(C)(4) embraced in Garcia does not uphold the "promises of the United States Constitution" and is "insufficient to eliminate the possibility of an arbitrary and capricious sentence, contrary to Furman. " Maj. Op. ¶¶ 12, 34. " Furman and Gregg ," they contend, "require more." Maj. Op. ¶¶ 74-75.
{180} The Majority misinterprets the United States Supreme Court's case law on capital punishment and comparative proportionality review and wrongly concludes that this Court is required to ensure a form symmetry in the capital sentencing context that is not required. As we shall see, the federal Constitution does not forbid the application of the death penalty simply because other defendants who committed superficially similar crimes did not receive death sentences. The Supreme Court's case law points in the opposite direction.
{181} "The origins of the [Supreme] Court's death penalty reform efforts can be traced to 1932, when it ruled [in Powell v. Alabama , 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ] that state criminal defendants have a right to appointed attorneys in capital cases." Robert A. Burt, Disorder in the Court: The Death Penalty and the Constitution , 85 Mich. L. Rev. 1741, 1743 (1987).
*1132 From 1932 until the 1960s, the "prehistory of death penalty jurisprudence," it "seemed unlikely ... that a constitutional claim against the death penalty as such would ever gain serious attention." Id. at 1744. This stems, in part, from the fact that "[t]he very text of the Constitution seemed to conclude the matter with the fifth amendment's explicit, though backhanded, endorsement that a person might be deprived of life so long as due process of law was observed." Id. (internal quotation marks and citation omitted). The view that the Court would not meaningfully question the constitutionality of capital punishment was confirmed by McGautha v. California , 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971).
{182} In McGautha , the Court considered whether a defendant's "constitutional rights were infringed by permitting the jury to impose the death penalty without any governing standards." Id. at 185, 91 S.Ct. 1454. The Court concluded that standards were not required by the Federal Constitution. Id. The reader, wondering how such a holding could be when not a year later in State v. Furman , 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Court reached the exact opposite conclusion, must know "that the Court had specifically restricted the grant of certiorari in McGautha to a due process challenge and in Furman the logically distinct 'cruel and unusual punishment' issue was addressed." Burt, supra , 1755 (internal quotation marks and citations omitted). If this explanation seems unsatisfactory, the reader may be consoled by the fact that others felt this way too.
{183} Justice Douglas openly questioned, in Furman , how the textual source of the right could explain the obvious tension between McGautha and Furman . Furman , 408 U.S. at 248 n.11, 92 S.Ct. 2726 (Douglas, J., concurring). And, "[o]f the Justices who participated in both McGautha and Furman , four (including Brennan) took apparently inconsistent positions in the two cases." Burt, supra , at 1754. This logical difficulty need not be worked out, it need only be noted.
{184} Furman was issued only one year after McGautha and, as is well known, it is comprised of nine separate opinions. Every Justice on the Court wrote. "[T]he majority 'opinion' in [ Furman ] is a one-paragraph per curiam invalidating under the Eighth Amendment the death sentences imposed on the three petitioners in the case." Carol S. Steiker & Jordan M. Steiker, Sober Second Thoughts: Reflections on Two Decades of Constitutional Regulation of Capital Punishment , 109 Harv. L. Rev. 355, 362 (1995). "Each of the five Justices in the majority then appended his own opinion, none of which was joined by any other Justice. Each of the four dissenters wrote his own opinion as well, although some of them joined in each other's dissents." Id. Because each Justice wrote separately, Furman is a case of unusual, if not overwhelming, complexity.
{185} Scholarship points out that "identifying the 'concerns' of Furman is a daunting task." Steiker, supra , 362. Any reader who picks up the opinion will see the truth of this immediately. The various "opinions present[ ] a staggering array of arguments for and against the constitutionality of the death penalty and offer[ ] little means, aside from shrewd political prediction, of determining which arguments would dominate in the decision of any future cases." Id. One writer suggests that Furman "so starkly deviated from the traditional format that it can be characterized as a decision in which there was not only no Court opinion but no Court-only a confederation of individual, even separately sovereign, Justices." Burt, supra , at 1758. The Justices themselves later acknowledged that "the variety of opinions supporting the judgment in Furman engendered confusion as to what was required in order to impose the death penalty in accord with the Eighth Amendment." Lockett v. Ohio , 438 U.S. 586, 599, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (Burger, J.). This is not to say, however, that we cannot discern from Furman a central proposition of law.
{186} Several of the Justices concurring in Furman pointed to statistics that showed that the death penalty was being applied on racial lines and with pronounced frequency on black defendants. 408 U.S. at 249-50, 92 S.Ct. 2726 (Douglas, J., concurring); id. at 310, 92 S.Ct. 2726 (Stewart, J., concurring); id. at 364, 92 S.Ct. 2726 (Marshall, J., concurring);
*1133 see generally Samuel R. Gross and Robert Mauro, Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization , 37 Stan. L. Rev. 27, 31-32 (1984). While this point of agreement is significant, it is not the main point of agreement in Furman . The main point of agreement between the concurring Justices was, as the Court later clarified, that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Zant v. Stephens , 462 U.S. 862, 874, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (internal quotation marks and citation omitted). Put slightly differently, "the unequivocal point of unison was that the death penalty was so arbitrary in its application, so as to render cruel and unusual any death sentence imposed under the existing system." Lucy Adams, Death by Discretion: Who Decides Who Lives and Dies in the United States of America? , 32 Am. J. Crim. L. 381, 383-84 (2005). This holding effectively put an end to capital punishment in the United States. But this was only temporary.
{187} In the wake of and in reaction to Furman , thirty-five state legislatures amended and then reenacted their death-penalty statutes. Burt, supra , at 1765. To some of the Justices concurring in Furman , this reenactment came as a surprise. Burt, supra , at 1766-67. These events prompted Marshall to openly question whether the American public was in fact an "informed citizenry." Gregg v. Georgia , 428 U.S. 227, 232, 96 S.Ct. 2971, 49 L.Ed.2d 904 (1976) (Marshall, J., dissenting). The constitutionality of these reenacted capital statutes was considered by the Court in five companion cases: Gregg ; Proffitt v. Florida , 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) ; Jurek v. Texas , 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) ; Woodson v. North Carolina , 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) ; and Roberts v. Louisiana , 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). All were issued on the same day. Burt, supra , at 1765. The resolutions reached in these cases constituted an abrupt about-face. See id. at 1751. Furman , it turns out, "was short-lived; ... the Court effectively reversed direction." Id.
{188} "Unlike Furman , each of the Justices did not speak or vote alone [in Gregg and its companion cases]. As in Furman , however, there was no Court at work. The judgments resulted from an aggregation of plurality voting lacking any majority rationale to explain the different outcomes in these cases." Burt, supra , at 1765. Yet, an outcome was produced.
{189} "[T]he Georgia [ ( Gregg ) ], Florida [ (Profitt ) ], and Texas [ ( Jurek ) ] statutes that specified various substantive standards for jury discretion" were upheld and "the North Carolina [ ( Woodson ) ] and Louisiana [ ( Roberts ) ] statutes that purported to abolish jury discretion by mandating death as the penalty for specific criminal offenses" were invalidated. Burt, supra , at 1765. " Gregg and its accompanying quartet clarified that the death penalty was not per se invalid under the Eighth Amendment and that the Court would now be involved in the ongoing business of determining which state schemes could pass constitutional muster." Steiker, supra , at 363. "The Gregg , Proffitt , and Jurek opinions did not attempt to list in any definitive fashion the prerequisites for a valid capital punishment regime; rather, they simply upheld each particular scheme presented on the basis of its own peculiar mix of procedural protections." Steiker, supra , at 363. Whether comparative proportionality was such a prerequisite was eventually litigated in Pulley .
{190} Unlike Furman and Gregg , Pulley garnered a six-justice majority opinion by Justice White. 465 U.S. at 38, 104 S.Ct. 871. Justice Stephens concurred in part and concurred in judgment, id. at 54, 104 S.Ct. 871, and Justices Brennan and Marshall dissented, restating their foundational objections to the death penalty, principal among them that the penalty is imposed and exacted along racial lines. Id. at 65, 104 S.Ct. 871. The defendant in Pulley , a California resident, was convicted of a capital crime, sentenced to death, and argued on appeal that California's capital punishment statute was unconstitutional as it did not provide for comparative *1134 proportionality review. Id. at 38-39, 104 S.Ct. 871. The Court rejected this assertion and held that California's capital punishment statute ensured that death sentences in California were not arbitrarily imposed, despite the fact that comparative proportionality review was not required. Id. at 48-51, 104 S.Ct. 871. The Court offered the following explanation for this conclusion.
{191} The Court examined the line of cases beginning with Furman and emphasized that those cases simply did not require comparative proportionality review to ensure that death sentences are not arbitrarily imposed. Pulley , 465 U.S. at 44-51, 104 S.Ct. 871. Rather the check on arbitrariness, the Court explained, was principally provided by a host of different mechanisms including: the bifurcation of trial and sentencing proceedings in the capital context; a limitation on crimes that may serve as death eligible offenses; and the requirement that juries consider aggravating and mitigating circumstances when deciding whether to impose a death sentence. Id. The Court also showed how in each of the capital cases preceding Pulley it was evident that the existence of comparative proportionality review was at maximum an optional, "additional safeguard[,]" 465 U.S. at 45, 104 S.Ct. 871, and at minimum "constitutionally superfluous." Id. at 49, 104 S.Ct. 871. The Court stressed that the suggestion that comparative proportionality was constitutionally required to ensure symmetry in capital sentencing was not only incorrect but suggested a misunderstanding of the import of Furman .
Any capital sentencing scheme may occasionally produce aberrational outcomes. Such inconsistencies are a far cry from the major systemic defects identified in Furman . As we have acknowledged in the past, there can be no perfect procedure for deciding in which cases governmental authority should be used to impose death.
Pulley , 465 U.S. at 54, 104 S.Ct. 871 (internal quotation marks and citations omitted). This point was, in fact, a position Justice White articulated in a slightly different way eight years earlier in Gregg, 428 U.S. at 225-26, 96 S.Ct. 2909 (White, J., concurring in judgment).
{192} There, Justice White rejected the contention, in broad and sweeping language, that capital sentencing must be carried out with perfect symmetry or not at all. I reproduce his words in their entirety as they have a force that is difficult to replicate.
[The] argument that there is an unconstitutional amount of discretion in the system which separates those suspects who receive the death penalty from those who receive life imprisonment, a lesser penalty, or are acquitted or never charged, seems to be in final analysis an indictment of our entire system of justice. Petitioner has argued, in effect, that no matter how effective the death penalty may be as a punishment, government, created and run as it must be by humans, is inevitably incompetent to administer it. This cannot be accepted as a proposition of constitutional law. Imposition of the death penalty is surely an awesome responsibility for any system of justice and those who participate in it. Mistakes will be made and discriminations will occur which will be difficult to explain. However, one of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder. I decline to interfere with the manner in which Georgia has chosen to enforce such laws on what is simply an assertion of lack of faith in the ability of the system of justice to operate in a fundamentally fair manner.
Id. In the last of the cases we need consider, McCleskey v. Kemp , 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Court reiterated that sentencing disparities in the capital context do not necessarily render the death penalty unconstitutional.
{193} The defendant in McCleskey -a black, male, resident of Georgia-was sentenced to death for murdering a white police officer in the course of a robbery. Id. at 283, 107 S.Ct. 1756. In a habeas petition challenging his conviction, the defendant submitted a sophisticated and rigorous statistical study establishing that black defendants in Georgia are, on the whole, more likely to be sentenced to death than white defendants and that this likelihood increases even further *1135 when the victim is white. Id. at 286-87, 107 S.Ct. 1756. The defendant claimed that this state of affairs rendered the Georgia death-penalty statute unconstitutional on equal protection and Eighth Amendment grounds. Id. at 291, 299, 107 S.Ct. 1756. The Court rejected both arguments, id. at 299, 308-19, 107 S.Ct. 1756, and rejected the Eighth Amendment claim with language that has unquestionable significance here.
{194} The Court understood the defendant to be arguing that his death sentence violated the Eighth Amendment because it was "disproportionate to the sentences in other murder cases[,]" id. at 306, 107 S.Ct. 1756, and responded to this claim with three points. First, the Georgia Supreme Court had already concluded that the defendant's death sentence "was not disproportionate to other death sentences" and supported this conclusion with citation to several "cases involving generally similar murders." Id. Second, Pulley made clear that, "where the statutory procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required." McCleskey , 481 U.S. at 306, 107 S.Ct. 1756 (citing Pulley , 465 U.S. at 50-51, 104 S.Ct. 871 ). Third, a defendant could not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty." Id. at 306-07, 107 S.Ct. 1756. The Court explained that " '[n]othing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.' " Id. at 307, 107 S.Ct. 1756 (quoting Gregg , 428 U.S. at 199, 96 S.Ct. 2909 ). The Court went on to clarify and expand upon this last point.
{195} The Court explained that " Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." Id. The Court then observed that the Georgia sentencing procedures from which McCleskey's sentence arose did adequately focus the sentencing authority's discretion. Id. at 308, 107 S.Ct. 1756. The Court accepted the fact that divergent sentencing outcomes in the capital sentencing context were inevitable, id. at 309-12, 107 S.Ct. 1756, identified the varying factors that made this so, id. at 307-08 n.28, 311-12, 107 S.Ct. 1756, and was unwilling to treat the racial disparities McCleskey's statistical study demonstrated as proof of unconstitutional prejudice against black defendants. Id. at 309, 107 S.Ct. 1756. The mere fact that juries in the capital context will reach divergent conclusions, the Court stated, is no basis to question the validity of those judgments. Id. at 311, 107 S.Ct. 1756. Why one jury would, in a particular case, impose death and another show mercy, the Court stated, probed into areas of human judgment that need not and cannot be explained.
Individual jurors bring to their deliberations qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. The capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant. It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgments that defy codification and that buil[d] discretion, equity, and flexibility into a legal system.
Id. (alteration in original) (internal quotation marks and citations omitted). Having concluded a survey of the relevant Supreme Court case law, we are now in a much better position to examine the Majority's claim that the federal constitution requires us to revisit Garcia and reconsider the comparative proportionality of Fry's and Allen's death sentences.
{196} The Majority cannot contend that the need to engage in the comparative proportionality review they suggest is necessary derives from the "promise" of the federal constitution. Where proportionality review need not be conducted to satisfy the constitution, it cannot be that a death sentence is *1136 unconstitutional because of some claimed failure to conduct meaningful enough statutory comparative proportionality review. In addition, the contention that Fry and Allen have been subjected to unconstitutionally arbitrary death sentences because of allegedly inadequate comparative proportionality review entirely ignores the fact that Fry and Allen are members of a select and specific cadre of murderers that may, under the CFSA, ever be permissibly put to death, and that Fry's and Allen's juries were only permitted to impose death sentences after Fry and Allen received the many procedural protections assured them by the CFSA. In other words, the Majority makes such a monolith of comparative proportionality review that they effectively ignore the many limiting and channeling functions of the CFSA.
D. Competing Forces at Work in the CFSA
{197} The Majority's construction of Section 31-20A-4(C)(4) seems to assume that, so long as we are assiduous enough in unearthing comparison cases and do as robust a comparative review as possible, we can be assured an objectively correct answer about the merits of a jury's capital sentencing decision will emerge. I respectfully disagree. This view ignores the tensions at work in the CFSA between the statute's requirement for individualized capital sentencing proceedings and consistent capital sentencing outcomes. These commands are at odds with one another and any construction of Section 31-20A-4(C)(4) must necessarily impose a compromise between them.
{198} The Majority appears to believe that these difficult tensions are resolved by the basic realization that "[c]omparative proportionality is not a question for the jury but rather is intended to serve as a check on the exercise of jury discretion in sentencing" and that "[t]he primary focus [in assessing the comparative proportionality of a death sentence] is not on the reasonableness of the jury's sentence of death, but rather on how that sentence compares to jury dispositions in comparable cases." Maj. Op. ¶ 77 (third alteration in original) (quoting Papasavvas , 790 A.2d at 827 (Stein, J., concurring)). This approach (1) wrongly diminishes the importance of individualized sentencing in the capital context, (2) overstates the efficacy and coherence of comparison as method, and (3) values consistency in the capital sentencing context over any other important and constitutionally significant concerns.
1. The importance of individualized sentencing in the capital context
{199} All of the provisions of the CFSA must be considered when construing its terms. State v. Thompson , 1953-NMSC-072, ¶ 9, 57 N.M. 459, 260 P.2d 370. Subsections 31-20A-1(B) and -2(B) direct that where a capital defendant is tried before a jury, that jury shall select the appropriate sentence. It is hardly surprising these provisions exist.
{200} "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson, 428 U.S. at 304, 96 S.Ct. 2978 (Stewart, Powell, and Stevens, JJ. concurring). The sentencing jury asked to "choose between life imprisonment and capital punishment can do little more-and must do nothing less-than express the conscience of the community on the ultimate question of life or death." Witherspoon , 391 U.S. at 519, 88 S.Ct. 1770. "And one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system-a link without which the determination of punishment would hardly reflect [the Eighth Amendment's concern with] the evolving standards of decency that mark the progress of a maturing society." Id. at 519 n.15, 88 S.Ct. 1770. It is inevitable that juries in the capital context will reach divergent outcomes in seemingly similar cases, and this, in and of itself, is no basis to question the validity of those judgments. McCleskey , 481 U.S. at 311, 107 S.Ct. 1756.
{201} Despite the fact that the CFSA gives to sentencing juries the authority to determine whether to impose death or extend mercy, and despite the fact that this *1137 delegation of authority has a constitutional dimension and necessarily grants discretion, Section 31-20A-4(C)(4) nevertheless directs this Court to verify the correctness of the sentencing jury's determination. The problem inherent with Section 31-20A-4(C)(4) should be self-evident.
{202} On one hand, the constitution requires an individual assessment of the capital defendant's circumstances and crime and the CFSA ensures that this will occur by granting to juries the right to decide the propriety of capital punishment. On the other hand, Section 31-20A-4(C)(4) assumes that the facts giving rise to death sentences may be flattened for comparison and that this Court may, somehow, meaningfully judge the capital sentencing determinations of juries. I am not the first to acknowledge that these concerns are entirely at odds with one another and present us with what appears to be an unresolvable conflict.
{203} Other courts have already recognized that comparison of capital sentences is inherently problematic given the "constitutional requirement for individualized sentencing in the imposition of death sentences," and is also inherently illogical as "that which is unique is also incommensurable." Addison , 7 A.3d at 1255. For these reasons, some have expressed the belief "that the entire concept of comparing death sentences is beset with so many problems that the exercise is incapable of meaningful application." Joseph T. Walsh, The Limits of Proportionality Review in Death Penalty Cases , 21 Del. Law. 13, 15 (2004). The experiment conducted in New Jersey over the last half-century compellingly illustrates this point and proves that comparative proportionality review is no panacea.
{204} The Majority mentions the statistical model of comparative proportionality review adopted by the New Jersey Supreme Court, Maj. Op. ¶ 45, but fails to note that some scholars denounce New Jersey's attempts-which have been vigorous and resource intensive-to make comparative proportionality review an empirical and scientific endeavor as nothing more than an "abject failure." Barry Latzer, The Failure of Comparative Proportionality Review of Capital Cases (with Lessons from New Jersey) , 64 Alb. L. Rev. 1161, 1234 (2001). The lesson to be learned from New Jersey is, according to some, one available from the exercise of common sense: "statistics can inform human judgment, not substitute for it." Id. The fact that comparative proportionality review is, as New Jersey teaches us, a process in which subjective, human judgment is exercised and not one whereby objective, empirical inquiry produces an objectively correct answer is one the Majority appears to reject. They present comparative proportionality review as an objective inquiry. It is not.
{205} Comparative proportionality review "is conducted on an individual basis for each death sentence" and "[a]t its heart, ... will always be a subjective judgment as to whether a particular death sentence fairly represents the values inherent in [any given] sentencing scheme for [the most depraved forms of] murder." Gregory , 427 P.3d at 637 (internal quotation marks and citation omitted). For this reason, the Majority's contention that this Court cannot inject its own subjective views about the propriety of any given death sentence-something the Majority seems to believe it is not doing-rings hollow. See Maj. Op. ¶ 11.
2. The limitations of comparison
{206} The Majority holds out cross-case comparison as a reliable method to evaluate the merits of death sentences and suggests that consistency in outcomes of capital cases is not only desirable but required. They embrace two incorrect assumptions: first, comparing death sentences, in the way envisioned by the Majority, reliably answers whether a death sentence has been appropriately imposed; and second, any perceived inconsistency in the application of the death penalty is unacceptable. Both of these assumptions are wrong.
{207} The type of comparison in which the Majority engages-one that seeks to assess the correctness of death sentences by scrutinizing the facts and details of capital crimes and sentences-is inappropriate. As one court effectively and imaginatively explained, a court undertaking comparative proportionality *1138 review should not treat the endeavor as a forensic scientist would.
[The defendant] would have us review [the comparative disproportionality of his death sentence] as a forensic scientist analyzes fingerprints, looking for a specified number of identity points. Only if one can conclusively determine that each swirl, ridge, and whorl is present in both samples is a match declared. We decline to do this. Crimes, particularly the brutal and extreme ones with which we deal in death penalty cases, are unique and cannot be matched up like so many points on a graph.
State v. Lord , 117 Wash.2d 829, 822 P.2d 177, 223 (1991) (overruled in part by State v. Schierman , 192 Wash.2d 577, 438 P.3d 1063 (2018). The point of the metaphor is that appellate courts cannot and should not sift through the fine details of capital crimes and the death sentences they produce and compare them. Doing this draws appellate courts into a realm they simply do not belong and provides only the most superficial assurance of the validity of a death sentence. And this point brings me back to my preliminary criticism of the language with which the Majority has described its task here. The validity of a death sentence cannot be based on our judgment about the severity of the murder that gave rise to the sentence.
{208} This Court does not sit in judgment of what crimes are most severe, heinous, and deserving of the death penalty. Section 31-20A-4(C)(4) cannot be construed to provide this Court that authority. To do so intrudes into an area that is reserved solely for the jury, the only entity capable of deciding what punishment is appropriate for the most severe violations of community norms. So what is the concern for courts undertaking a comparative proportionality review?
{209} The concern "is with alleviating the types of major systemic problems identified in Furman : random arbitrariness and imposition of the death sentence based on race." Lord , 822 P.2d at 223. "Technical inconsistencies in a line-by-line comparison cannot be equated with those core concerns." Id. Comparative proportionality review is simply "not intended to ensure that there can be no variation on a case-by-case basis, nor to guarantee that the death penalty is always imposed in superficially similar circumstances." Id.
{210} For these reasons, the secondary literature indicates that death sentences are overturned as comparatively disproportionate only very rarely. See Leigh B. Bienen, The Proportionality Review of Capital Cases By State High Courts After Gregg: Only "The Appearance of Justice? ", 87 J. Crim. L. & Criminology 130 (1996) (surveying the states that perform comparative proportionality review and noting only a limited number of instances where death sentences were overturned as comparatively disproportionate). It is, ironically, the Majority's position in this case that is the outlier.
3. Consistency at all costs
{211} There is no reason why a death sentence imposed upon a defendant who committed a particularly deplorable, death-eligible murder could not stand alone as a permissible death sentence despite the fact that all other death-eligible defendants received only life sentences. The existence of a statistical outlier in no way establishes that the imposition of a death sentence is necessarily comparatively disproportionate so long as there is some justification for that death sentence . Garcia seems to have embraced this very thought when it observed that a death sentence could be justified even if life sentences were normally imposed for the category of murder in which the crime producing the sentence belongs so long as there is "some justification" for that death sentence. 1983-NMSC-008, ¶ 34, 99 N.M. 771, 664 P.2d 969.
{212} It is difficult to see how, if our Legislature ever elected to reinstate the death penalty, any murder involving kidnapping or sexual assault could possibly be deemed not comparatively disproportionate in the wake of the Majority's opinion. And this illuminates the point that comparative disproportionality is-if taken too far and permitted to serve as a demand for the sort of symmetry and consistency in sentencing Pulley and McCleskey made clear is neither practical nor required-the "poisoned pill"
*1139 the Majority claims it is not. See Maj. Op. ¶ 53 (stating that comparative proportionality review is not a "poisoned pill" designed to eliminate the death penalty in entire categories of murder, an outcome that would indeed be a "de facto repeal of the death penalty").
E. Garcia , Its Application in Fry's and Allen's Cases, and Stare Decisis
1. Garcia was correctly decided
{213} Garcia construed Section 31-20A-4(C)(4) as limiting the pool of comparison cases to those "in which a defendant was convicted under the same aggravating circumstance(s) and then received either the death penalty or life imprisonment" Garcia , 1983-NMSC-008, ¶ 34, 99 N.M. 771, 664 P.2d 969. The Majority takes issue with this, but I fail to see how this construction is flawed or unworkable. Two points are offered in defense of Garcia .
{214} First, Section 31-20A-4 is closely related to Georgia's death-penalty statute. Ruth Musgrave Silver, Constitutionality of the New Mexico Capital Punishment Statute , 11 N.M. L. Rev. 269, 286 (1981). Georgia's statute requires that the state supreme court "obtain and preserve records of all capital cases in which the death penalty was imposed after January 1, 1970" so that "similar cases may be compared." Id. The CFSA does not include a similar requirement. Why did our Legislature not include in the CFSA a comparable provision? It must be because our Legislature did not intend this Court to engage in the type of searching inquiry the Majority now claims Section 31-20A-4(C)(4) requires.
{215} Second, Section 31-20A-4(C)(4) states that the inquiry into the excessiveness or disproportionality of a death sentence is one evaluated with respect "to the penalty imposed in similar cases" and must take into account "both the crime and the defendant." The manner in which the statute uses the words "cases" and "crime" is suggestive.
{216} Section 31-20A-4(C)(4) 's use of these two words confirms that the Legislature clearly understood they have distinct and different meanings. See Norman J. Singer and Shambie Singer, 2A Sutherland Statutes and Statutory Construction § 46:6 (7th ed. 2014). A murder "case" is a specific iteration of murder involving a specific set of facts. This is distinct from murder as a "crime," a concept that would encompass a wide array of different types of murder cases. Section 31-20A-4(C)(4) 's use of the phrase "similar cases" suggests that the pool of cases for comparison should be comprised of a limited number of cases closely mirroring the murder for which a defendant received the death sentence. Garcia does just this.
2. Application of Garcia in Fry's and Allen's cases
{217} Review of how Garcia was applied in Fry's and Allen's direct appeals shows that Garcia sensibly construed the statutory language. Fry's death sentence was compared with six cases. These cases involved the aggravating circumstance of kidnapping-the aggravating factor that made Fry death eligible. Four of the comparison cases were death sentences: Allen , 2000-NMSC-002, 128 N.M. 482, 994 P.2d 728 ; Clark , 1999-NMSC-035, 128 N.M. 119, 990 P.2d 793 ; Guzman , 1984-NMSC-016, 100 N.M. 756, 676 P.2d 1321 ; Gilbert , 1983-NMSC-083, 100 N.M. 392, 671 P.2d 640. Two of the comparison cases were life sentences: McGuire , 1990-NMSC-067, 110 N.M. 304, 795 P.2d 996 and Hutchinson , 1983-NMSC-029, 99 N.M. 616, 661 P.2d 1315. This Court was persuaded that the extremely violent nature of Fry's criminal acts, in conjunction with the horror his victim likely suffered in the process of the murder, amply supported the conclusion that Fry's death sentence was not comparatively disproportionate. Fry's criminal acts were sufficiently similar to other cases where juries imposed death sentences and sufficiently deplorable to distinguish it from those cases where life sentences were imposed. See Fry , 2006-NMSC-001, ¶ 44, 138 N.M. 700, 126 P.3d 516.
{218} In Allen , the Court relied on the comparative proportionality analysis in Clark given the similarities between Clark's and Allen's crimes. In Clark , this Court identified two cases where defendants received death sentences for murders involving the aggravating factors of kidnapping and murder of a witness- *1140 Guzman , 1984-NMSC-016, 100 N.M. 756, 676 P.2d 1321 and Gilbert , 1983-NMSC-083, 100 N.M. 392, 671 P.2d 640 -and two cases where the defendants received life sentences for murders involving these same aggravating circumstances- McGuire , 1990-NMSC-067, 110 N.M. 304, 795 P.2d 996 and Hutchinson , 1983-NMSC-029, 99 N.M. 616, 661 P.2d 1315. Clark , 1999-NMSC-035, ¶ 79, 128 N.M. 119, 990 P.2d 793. Clark also received a death sentence for a murder involving these aggravating circumstances. Id. ¶¶ 78, 82. The aggravating factors of kidnapping and murder of a witness, along with the fact that Allen's victim was a child, satisfied this Court that Allen's crime was more equivalent to murders where a death sentence was imposed. Allen , 2000-NMSC-002, ¶ 111, 128 N.M. 482, 994 P.2d 728.
{219} There is nothing wrong or inadequate about the Court's analysis in either case. In both instances, the Court paid appropriate deference to the respective jury determinations while simultaneously examining death and life sentences in similar cases.
3. Stare decisis
{220} The principle of stare decisis is at its zenith when this Court is asked to reconsider the meaning of statutes where the previous interpretation was accepted by our Legislature. United States v. Lane , 474 U.S. 438, 460 n.1, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Once litigants draw this Court into the realm of statutory construction and require us to decide the meaning of statutory language, it is thereafter the province of the Legislature to decide whether the particular meaning adopted by the Judiciary is the one actually intended by the Legislature. Shepard v. United States , 544 U.S. 13, 23, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). To short-circuit this process undoes that which the Legislature has embraced. These principles have unique significance here.
{221} Garcia has been challenged over the years and this Court has repeatedly declined to reconsider the comparative proportionality methodology adopted there. See Fry , 2006-NMSC-001, ¶ 45, 138 N.M. 700, 126 P.3d 516 ; Allen , 2000-NMSC-002, ¶ 111, 128 N.M. 482, 994 P.2d 728 ; Clark , 1999-NMSC-035, ¶ 73, 128 N.M. 119, 990 P.2d 793. In addition, Garcia was an opinion that elicited a dissenting voice. Thus, the Legislature surely understood that this Court did not unanimously agree that the language under consideration in Garcia had only one possible meaning. Lastly, the question under consideration in Garcia is not some obscure point of law relevant only to a niche area of practice. It concerns matters of the greatest possible significance and to which the public at large pays considerable attention.
{222} For these reasons, there can be no doubt that the Legislature was aware of the debate surrounding Garcia and was perfectly capable of overturning our construction of its words if they believed our construction lacking in some respect. It did not, and this failure to act has unquestionable significance. The Legislature embraced Garcia . The Majority rejects this conclusion, but for reasons that do not withstand scrutiny.
{223} The Majority states that "the Legislature's intent in adopting Section 31-20A-4(C)(4) is clear from its history, and our application of Garcia has not fulfilled that purpose." Maj. Op. ¶ 81. They cite authority stating that legislative inactivity cannot ratify a clearly erroneous interpretation of a statute. Maj. Op. ¶ 82. That the Majority is certain that Garcia was wrongly decided does nothing to change the fact that this Court has consistently affirmed Garcia for decades. The suggestion that legislative acquiescence has no force here because it was always plain to see that Garcia was wrongly decided strains credulity.
F. Finality
{224} The Majority's ruling tells those convicted and sentenced under lawful proceedings later affirmed that they need never "reconcile themselves" to sentences imposed and affirmed and broadcasts to the public "that we have no confidence that the laws are administered justly." Spalding v. Aiken , 460 U.S. 1093, 1096-97, 103 S.Ct. 1795, 76 L.Ed.2d 361 (1983) (Burger, J. concurring in denial of certiorari). Moreover, it is "[o]nly with an assurance of real finality [that] the State [can] execute its moral judgment in a case. Only with real finality can the victims of crime move forward knowing the moral judgment *1141 will be carried out." Calderon v. Thompson , 523 U.S. 538, 556, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). "To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." Id. (internal quotation marks and citations omitted). These concerns with finality are not merely academic, abstract, or hypothetical. We need only listen to victims of crime to see the truth of this point.
{225} In 1981, Michael Guzman abducted Colleen Bush and her friend Julie Jackson as they walked home late one night from UNM. Guzman , 1984-NMSC-016, ¶¶ 3-4, 100 N.M. 756, 676 P.2d 1321. After abducting the women, Guzman stabbed Bush repeatedly and then raped and murdered Jackson. Id. ¶¶ 5 -7. Bush survived the ordeal. Id. ¶¶ 5 -6. Guzman surrendered himself to the authorities, was convicted of first-degree murder and other serious offenses, and received a death sentence that was commuted. Id. ¶¶ 1, 8 ; Exec. Order No. 86-39 (Nov. 26, 1986). Some thirty years later, Guzman filed a habeas petition alleging new evidence entitled him to a new trial. A hearing on that petition was held. Ms. Bush attended that hearing and offered the following remarks:
No one in the criminal justice process has ever asked what it's like for me, as the victim in this case, to survive the defendant's requests for new hearings over the last 25 years. ... It is excruciating. Your honor, to go through delay after delay has been torture for me. Here we are again, with another habeas corpus petition. ... [T]he habeas corpus procedures ... need to be reformed to prevent continuing state-sanctioned psychological brutalization of victims of horrific crimes like myself. ... This man kidnapped, raped and murdered my best friend, who was a kind and gentle person, and he thought he had done the same to me. As the victim of a violent crime I have rights, too. I have the right to be treated with fairness and respect for my dignity. I have the right to a timely disposition. Where is the fairness? Where is the dignity? And where is the timely disposition? This needs to stop now. Each continuance is like a knife in my heart and, your honor, I have been stabbed enough.
Leslie Linthicum, Guzman murder case hearings reopen old wounds , Albuquerque Journal (Aug. 1, 2013), https://www.abqjournal.com/240179/guzman-murder-case-hearings-reopen-old-wounds.html (last visited May 23, 2019). It is unnecessary to state in express terms what this Court should glean, in the present context, from this victim's agony.
III. CONCLUSION
{226} The words of Justice Brennan, made in a similar context but for different reasons, summarize my thoughts: "In my view the Court errs at all points from its premises to its conclusions." McGautha , 402 U.S. at 249, 91 S.Ct. 1454 (Brennan, J., dissenting). The Majority misstates the governing law and has done what our Legislature would not: repeal the death penalty in its entirety for all defendants in New Mexico. "When society promises to punish by death ..., and then the courts fail to do so, ... they undermine the integrity of the entire criminal justice system." Coleman v. Balkcom , 451 U.S. 949, 959, 101 S.Ct. 2994, 68 L.Ed.2d 334 (1981) (Rehnquist, J., dissenting from denial of certiorari).
{227} For these reasons, I respectfully dissent.
I CONCUR:
PETRA JIMENEZ MAES, Justice, Retired, Sitting by designation